# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

Michael Davis,

*Plaintiff-Appellant*,

v.

Lockheed Martin Corporation,

*Defendant-Appellee*

Appeal from the United States District Court
for the Middle District of Florida

No. 6:22-cv-81-RBD-DCI

## APPELLANT'S OPENING BRIEF

Josh Autry
Morgan & Morgan
333 W Vine St, Ste 1200
Lexington, KY 40507
859-899-8785
jautry@forthepeople.com

Rene F. Rocha
Morgan & Morgan
400 Poydras St, Ste 1515
New Orleans, LA 70130
954-318-0268
rrocha@forthepeople.com

Adam P. Bergeron
Morgan & Morgan
47 Maple St, Ste 104D
Burlington, VT 05401
407-974-2075
adambergeron@forthepeople.com

*Attorneys for Appellant Michael Davis*

**Michael Davis v. Lockheed Martin Corporation**

C<small>ERTIFICATE OF</small> I<small>NTERESTED</small> P<small>ERSONS</small>

Albanis, Panagiotis V.

Appel, Marie N.

Askren, Jillian M.

Autry, Josh

Bergeron, Adam P.

Citera, Francis A.

Dalton Jr., Roy B., U.S. District Judge

Davis, Michael

De Milt, Donna

Estate of Carol Davis

Goldrosen, Eitan

Hopper, Ryan T.

Irick, Daniel C., U.S. Magistrate Judge

Jackson, Raymond D.

Jarecki, Shawn K.

Juda, Laura

Juda, Mark

Kantor, Daniel

Kantor Neurology

Kendall, Ronald J.

Khasin, Irina

Kozak, Jeff

Lockheed Martin Corporation LMT

McGarry, Ann

McGarry, Michael

Miller, Gretchen N.

Moore, Joshua D.

Morgan & Morgan, P.A.

Morgan, T. Michael

Petosa, Frank M.

Porter, Bryan C.

Ram, Michael F.

Rocha, Rene F.

Rutledge, Eric

San Martin, Emilio

Slusarz, Brian

Torres, Christopher

University City Property Management III, LLC

Weinstein, David B.

White, Christopher

Winn, Jennifer N.

## REQUEST FOR ORAL ARGUMENT

Plaintiff-Appellant Michael Davis respectfully requests oral argument to address the abuses of discretion committed by the district court, as detailed in this brief, as well as any additional issues raised in the brief of Defendant-Appellee.

Certificate of Interested Persons .............................................................C-1

Request for Oral Argument ..................................................................... i

Table of Contents ................................................................................. ii

Table of Citations ............................................................................... iii

Jurisdictional Statement .........................................................................v

Statement of the Issues..........................................................................1

Statement of the Case............................................................................3

    I.   The course of proceedings and dispositions in the court below....................4

    II.   Statement of the facts ..................................................................5

Statement of the Standard of Review........................................................8

Summary of the Argument ...................................................................11

Argument...........................................................................................13

    I.   The district court abused its discretion by not analyzing the epidemiological literature offered by Dr. Kantor to support his opinion. ......................................13

    II.   The district court abused its discretion by not evaluating additional evidence supporting the theory of causation together with the epidemiological evidence. ........................................................................21

    III.   The district court abused its discretion by concluding that only studies limited to the five solvents at issue can be a reliable basis for Dr. Kantor's opinion. ..................................................................................25

    IV.   The district court abused its discretion by mischaracterizing the NIEHS expert consensus statement and applying the wrong legal standard to it. ..........29

    V.   Dr. Kantor employed a reliable literature review process consistent with Eleventh Circuit precedent.....................................................................33

        A.   Dr. Kantor reliably selected and weighed the literature. ........................34

        B.   Where an expert relies on statistically significant studies, a single statistically insignificant study does not render the expert's methodology unreliable.............................................................................37

        C.   Listing negative studies in a report is not a prerequisite to reliability....40

Conclusion .......................................................................................42

# TABLE OF CITATIONS

*Adams v. Laboratory Corp. of America*,
   760 F.3d 1322 (11th Cir. 2014) ............................................................ passim

*Allison v. McGhan Med. Corp.*,
   184 F.3d 1300 (11th Cir. 1999) ............................................................ passim

*Ambrosini v. Labarraque*,
   101 F.3d 129 (D.C. Cir. 1996) ..................................................................42

*Anderson v. Raymond*,
   59 F.4th 279 (7th Cir. 2023) ......................................................................29

*Aycock v. R.J. Reynolds Tobacco Co.*,
   769 F.3d 1063 (11th Cir. 2014) ................................................................34

*Chapman v. Procter & Gamble Distribg., LLC*,
   766 F.3d 1296 (11th Cir. 2014) ........................................................ 16, 23

*Cox v. St. Joseph's Hosp.*,
   71 So.3d 795 (Fla. 2011) ...........................................................................34

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) .............................................................................. passim

*Elosu v. Middlefork Ranch*,
   26 F.4th 1017 (9th Cir. 2022) ....................................................................21

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ...................................................................................15

*Glaser v. Thompson Med*,
   32 F.3d 969 (6th Cir. 1994) .......................................................................42

*Gooding v. Univ. Hosp. Bldg.*,
   445 So.2d 1015 (Fla. 1984) .......................................................................34

*Hardeman v. Monsanto*,

997 F.3d 941(9th Cir. 2021).........................................................................42

*Hemmings v. Tidyman's Inc.*,
    285 F.3d 1174 (9th Cir. 2002).............................................................28

*Hendrix ex rel. G.P. v. Evenflo Co.*,
    609 F.3d 1183 (11th Cir. 2010).............................................. passim

*Huss v. Gayden*,
    571 F.3d 442 (5th Cir. 2009)...............................................................33

*In re Abilify (Aripiprazole) Prod. Liab. Litig.*,
    299 F. Supp. 3d 1291 (N.D. Fla. 2018) ................................ 39, 40

*In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*,
    9 F.4th 768 (8th Cir. 2021)..................................................................33

*In re Seroquel Prod. Liab. Litig.*,
    2009 WL 3806435 (M.D. Fla. June 23, 2009) ...................... 23, 26

*In re Zantac (Ranitidine) Prod. Liab. Litig.*,
    644 F. Supp. 3d 1075 (S.D. Fla. 2022) .................................. 19, 20

*In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*,
    26 F. Supp. 3d (E.D. Pa. 2014) ....................................... 21, 44, 45

*Kilpatrick v. Breg, Inc.*,
    613 F.3d 1329 (11th Cir. 2010)............................................. passim

*Maiz v. Virani*,
    253 F.3d 641 (11th Cir. 2001)...............................................................14

*Milward v. Acuity Specialty Prod. Grp.*, Inc.,
    639 F.3d 11(1st Cir. 2011) ...................................................................28

*Norris v. Baxter Healthcare Corp.*,
    397 F.3d 878 (10th Cir. 2005)) ...................................................16

*Primiano v. Cook*,
    598 F.3d 558 (9th Cir. 2010)...............................................................28

iv

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
   326 F.3d 1333 (11th Cir. 2003) .................................................. 10, 28, 30, 32

*Rider v. Sandoz Pharm. Corp.*,
   295 F.3d 1194 (11th Cir. 2002) ........................................................... passim

*Rosenfeld v. Oceania Cruises, Inc.*,
   654 F.3d 1190 (11th Cir. 2011) ....................................................32

*Schultz v. Akzo Nobel Paints*,
   721 F.3d 426 (7th Cir. 2013) .........................................................42

*Seamon v. Remington Arms Co.*,
   813 F.3d 983 (11th Cir. 2016) ..................................................9, 10, 11

*Siharath v. Sandoz Pharm. Corp.*,
   131 F. Supp. 2d 1347 (N.D. Ga. 2001) .........................................23

*Sorrels v. NCL (Bahamas) Ltd.*,
   796 F.3d 1275 (11th Cir. 2015) ....................................................10

*U.S. v. Nahmani*,
   696 Fed. Appx. 457 (11th Cir. 2017) ............................................28

*U.S. v. W.R. Grace*,
   504 F.3d 745 (9th Cir. 2007) ........................................................28

*United Fire & Cas. Co. v. Whirlpool Corp.*,
   704 F.3d 1338 (11th Cir. 2013) ........................................11, 22, 45

*United States v. Alabama Power Co.*,
   730 F.3d 1278 (11th Cir. 2013) ......................................... 9, 21, 35

*Von Duprin v. Major Holdings*,
   12 F.4th 751 (7th Cir. 2021) .........................................................28

*Wells v. Ortho Pharm. Corp.*, 788 F.2d 741 (11th Cir. 1986) ..................................33

*Williams v. Mosaic Fertilizer, LLC*,
   889 F.3d 1239 (11th Cir. 2018) ....................................................35

# JURISDICTIONAL STATEMENT

The district court exercised diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1), because Plaintiff is a citizen of Florida, Defendant is a Delaware corporation with its principal place of business in Maryland, and the amount in controversy exceeds $75,000.[1] This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, based on Plaintiff's appeal from the district court's final judgment disposing of all claims. This appeal is timely under Fed. R. App. P. 4(1)(A) because it was noticed on January 9, 2024 (Doc. 230), within 30 days after the district court entered Judgment on December 12, 2023 (Doc. 231).

---

[1] First Amended Complaint, Doc. 8 ¶¶ 17, 20-21; Answer, Doc. 9 ¶ 20.

1.　　Whether the district court abused its discretion by not analyzing the epidemiological literature offered by Dr. Kantor to support his opinion. (Argument Section I)

2.　　Whether the district abused its discretion by not analyzing additional evidence supporting the theory of causation together with the epidemiological evidence. (Argument Section II)

3.　　Whether the district court abused its discretion by concluding that only studies limited to the five solvents at issue can be a reliable basis for Dr. Kantor's opinion. (Argument Section III)

4.　　Whether the district court abused its discretion by mischaracterizing the NIEHS expert consensus statement and applying the wrong legal standard to it. (Argument Section IV)

5.　　Whether Dr. Kantor employed a reliable literature review process consistent with Eleventh Circuit precedent. (Argument Section V)

Plaintiff alleges that his deceased wife, Carol Davis, was exposed to toxic solvents for several decades during her employment at Defendant's manufacturing facility in Orlando, Florida, and that consequently she suffered from multiple sclerosis and death. This appeal focuses on the causation opinions of Dr. Daniel Kantor who opined that the solvents tetrachloroethylene (PCE), trichloroethylene (TCE), toluene, xylene, and styrene, individually or in mixtures, caused Mrs. Davis's multiple sclerosis.

Although Dr. Kantor's qualifications have not been challenged, he is well qualified to offer causation opinions in this case. He is a board-certified neurologist, President Emeritus of the Florida Society of Neurology, and a Vice President for Clinical Research & Development at a neurological research institute.[2] He is also a former Director of Florida Atlantic University's Division of Neurology, the Inaugural Neurology Residency Program Director at Florida Atlantic University, and a former Director of University of Florida's Comprehensive Multiple Sclerosis Center, among other professional engagements.[3] Dr. Kantor is recognized as a specialist in multiple sclerosis and other neuro-immune diseases.[4]

---

[2] Doc. 58-1 p. 2.
[3] Doc. 58-1 p. 2.
[4] Doc. 58-1 p. 2.

## I.      The course of proceedings and dispositions in the court below

On December 11, 2023, the district court granted Defendant's motion to exclude the testimony of Plaintiff's two causation experts, Dr. Kantor, a neurologist, and Dr. Ronald Kendall, a toxicologist, who both opined that the solvents used at Defendant's facility were capable of causing multiple sclerosis.[5] The district court's ruling was "solely predicated" on Dr. Kantor's methodology.[6] Defendant did not challenge Dr. Kantor's qualifications and the district court rejected Defendant's "fit" arguments.[7] After excluding Dr. Kantor, the court also excluded Dr. Kendall on the basis that he "primarily relies on Dr. Kantor's opinions."[8] The court's ruling did not mention a third expert, Dr. Ranajit Sahu, who connected the exposure conditions in epidemiological studies to the solvent exposures suffered by Mrs. Davis.[9] Based on its exclusion of Drs. Kantor and Kendall, the court entered summary judgment in Defendant's favor.[10]

Prior to its decision excluding Drs. Kantor and Kendall (Doc. 230), the district court entered an order addressing general causation issues (Doc. 219). In that order, which has not been appealed, the court revisited its earlier decision to bifurcate

---

[5] Doc. 230 p. 12. *See also* Kantor Report, Doc. 58-1; Kantor Rebuttal Report, Doc. 58-2; Kendall Report, Doc. 59-1; and Kendall Rebuttal Report, Doc. 59-2.
[6] Doc. 230 p. 4 fn. 2.
[7] Doc. 230 p. 4 fn. 2.
[8] Doc. 230 p. 12.
[9] Sahu Report, Doc. 159-8.
[10] Doc. 230 p. 12.

general and specific causation for purposes of discovery and motions. The court determined that it should not have bifurcated general and specific causation because "the Court is left with an incomplete record from which to determine general causation."[11] So, the court explained that it would, in a subsequent order, "conduct the full general and specific causation inquiries together with the full scientific record before it, as it should have from the beginning."[12] The court indicated that it would "take a deeper look at the individual studies" in its subsequent order,[13] but as explained in this brief, the court never engaged in a deeper look at the individual studies.

## II.    Statement of the facts

In 1981, at 24 years of age, Mrs. Davis began working at Defendant's Microelectronics Center (MEC) where her job duties supported the manufacture of semiconductors.[14] According to Dr. Sahu's analysis, Mrs. Davis was chronically exposed to solvents during the course of her employment in three ways: through the use of solvents in the MEC building (occupational exposure); through vapor intrusion from contaminated soil and groundwater; and through emissions from air stripping towers.[15]

_____

[11] Doc. 219 p. 18.
[12] Doc. 219 p. 18.
[13] Doc. 219 p. 9.
[14] Doc. 157-7 p. 3-4; Doc. 159-8 p. 5.
[15] Doc. 159-8 p. 3-7.

Mrs. Davis's exposure to solvents was particularly substantial in the period of time from 1981 to 1985 when "Lockheed Martin was storing and transporting solvents in an inaccessible maze of leaking pipes and deteriorated underground storage tanks underneath the MEC."[16] When the leaks were discovered, source investigations revealed elevated concentrations of solvents in the groundwater underneath the MEC building, indicating that these solvents were being used in significant volumes at the MEC.[17] Dr. Sahu described in his report a "massive volume" of solvent wastes that were improperly handled by Defendant leading to "significant contamination of soil and groundwater" during Mrs. Davis's employment.[18] Based on his review of the records, Dr. Sahu concluded that Mrs. Davis would likely have been exposed to large amounts of PCE, TCE, styrene, toluene, xylenes and other solvents during her time working at Defendant's MEC building.[19]

In the mid-1980s, a few years after starting her job at the MEC, Mrs. Davis began having neurologic symptoms, including visual difficulties, facial pain, and foot pain.[20] In 1992, at age 35, a neurologist diagnosed her with multiple sclerosis.[21]

---

[16] Doc. 159-8 p. 9.
[17] Doc. 159-8 p. 5.
[18] Doc. 159-8 p. 6.
[19] Doc. 159-8 p. 3-7.
[20] Doc. 157-7 p. 4.
[21] Doc. 157-7 p. 4.

Her disease progressed rapidly. By 1998, she was declared disabled and stopped working for Defendant.[22] By 2013, she needed a wheelchair; by 2017, she required a feeding tube.[23] Mrs. Davis died on January 14, 2020, at age 69.[24]

A brain MRI revealed that Mrs. Davis's disease was "worse than the vast majority of people with MS" and that she had "among the 1-2% most severe MRI findings" which is atypical for idiopathic multiple sclerosis and consistent with occupational exposure.[25] Dr. Kantor's differential diagnosis ruled out all other risk factors for multiple sclerosis, leaving solvent exposure as the only likely cause.[26]

Dr. Kantor's general causation opinion is supported by three meta-analyses pooling data from dozens of individual epidemiological studies (Landtblom 1996, Barragan-Martinez 2012, Gerhardsson 2021),[27] two case-control epidemiological studies (Hedstrom 2018 and Bostrom 2019),[28] a cohort epidemiological study (Riise 2002),[29] a NIEHS expert panel consensus statement on the epidemiological evidence,[30] an explanation of the mechanism of action supported by numerous

---

[22] Doc. 161-1 p. 5-6; Doc. 161-6 p. 19.
[23] Doc. 157-7 p. 4.
[24] Doc. 157-7 p. 4.
[25] Doc. 157-7 p. 4-6.
[26] Doc. 157-7 p. 5-6.
[27] Doc. 138-11; Doc. 138-2; Doc. 138-5.
[28] Doc. 138-8; Doc. 138-4.
[29] Doc. 138-19.
[30] Doc. 138-17.

animal studies,[31] and undisputed evidence that the solvents at issue in this case target and damage the central nervous system.[32] This evidence is discussed in more detail in the applicable Argument sections.

The admission of expert opinion testimony is governed by Federal Rule of Evidence 702 and the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. *Adams v. Laboratory Corp. of America*, 760 F.3d 1322, 1327-28 (11th Cir. 2014). An expert may testify in the form of an opinion when three criteria are met: (1) the expert is qualified; (2) the expert applied a reliable methodology; and (3) the expert's opinion will assist the jury. *Id.* at 328. Here, only the second prong—reliability—is at issue.

Reliability "concerns 'whether the reasoning or methodology underlying the testimony is scientifically valid and … whether that reasoning or methodology properly can be applied to the facts in issue.'" *Seamon v. Remington Arms Co.*, 813 F.3d 983, 988 (11th Cir. 2016) (quoting *Daubert*, 509 U.S. at 592–93).

In a toxic tort case, this Court has recognized that a "scientifically valid method [] for establishing general causation" is to offer an expert opinion "supported

---

[31] Doc. 58-1 p. 6-7, 10, 13-14, 20-21, 29; Doc. 58-3 p. 53-54.
[32] Doc. 58-1 p. 4-6 (PCE); 8-9 (TCE); 16-18 (toluene); 20-21 (xylenes); 21-22 (styrene); and 31 (summary of neurodegeneration effects); Doc. 174-1 p. 17 (styrene); 19 (PCE); and 21 (TCE).

by epidemiological studies, provided the expert explains how the findings of those studies may be reliably connected to the facts of the particular case." *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1196-97 (11th Cir. 2010); *see also id*. at 1198 n.11 (recognizing that an expert may rely "exclusively on medical literature to establish general causation" so long as it "provide[s] enough support").

This Court has "repeatedly stressed *Daubert*'s teaching that the gatekeeping function under Rule 702 'is not intended to supplant the adversary system or the role of the jury: vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking *shaky but admissible evidence*.'" *Adams*, 760 F.3d at 1334 (quoting *United States v. Alabama Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013) and *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311-12 (11th Cir. 1999)) (emphasis added by the *Adams* Court).

"Once an expert opinion has satisfied *Daubert*, a court may not exclude the opinion simply because it believes that the opinion is not—in its view—particularly strong or persuasive. The weight to be given to admissible expert testimony is a matter for the jury." *Seamon v. Remington Arms Co.*, 813 F.3d 983, 990 (11th Cir. 2016); *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) ("[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence").

This Court reviews the district court's exclusion of expert testimony for abuse of discretion. *Seamon*, 813 F.3d at 987. "A district court abuses it discretion when it makes a clear error in judgment or applies an incorrect legal standard." *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1281 (11th Cir. 2015); *Adams*, 760 F.3d at 1331 ("[A]n error of law [in the context of conducting a *Daubert* review] is necessarily an abuse of discretion.").

This Court has held that a district court abuses its discretion when it fails to consider or correctly characterize the evidence supporting an expert's opinion. *See Seamon*, 813 F.3d at 991 (finding an abuse of discretion when the district court mischaracterized the expert's opinion and the evidence supporting it); *Adams*, 760 F.3d at 1328-29 (finding an abuse of discretion when the district court excluded an expert on the basis that her opinion was "an *ipse dixit* assessment," when her opinion was grounded in the available evidence); *Alabama Power*, 730 F.3d at 1284-88 (holding that the exclusion of an expert was an abuse of discretion because the district court mischaracterized the evidence supporting the expert's opinion); *United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341-42 (11th Cir. 2013) (reversing exclusion of expert testimony because the district court had failed to consider the evidence supporting the opinion).

When a district court's summary judgment decision rests entirely on its exclusion of expert testimony, this Court will reverse the summary judgment

decision if it reverses the district court's decision to grant the motion to exclude. *Seamon*, 813 F.3d at 991.

## SUMMARY OF THE ARGUMENT

The crux of this appeal is that the district court did not analyze the scientific literature offered by Dr. Kantor in support of his general causation opinion—not even mentioning one study by name in its decision. As a result, the district court could not appreciate that Dr. Kantor offered three meta-analyses pooling data from dozens of epidemiological studies (Landtblom 1996, Barragan-Martinez 2012, Gerhardsson 2021), two individual case-control epidemiological studies (Hedstrom 2018, Bostrom 2019), and a cohort epidemiological study (Riise 2002). All of the studies included an odds ratio or relative risk showing a positive association between exposure to solvents and development of multiple sclerosis.

With only a superficial analysis of the literature, the district court made a sweeping conclusion that none of it could support Dr. Kantor's conclusion because the studies involved solvent mixtures rather than the exact five solvents at issue in this case. But this conclusion overlooked the studies that did include the solvents at issue, and a meta-analysis reporting individual odds ratios for each of the relevant solvents in this case. More importantly, the court made an improper ultimate conclusion as to the persuasiveness of the studies when it should be a question of the weight to afford the evidence at trial. Compounding this error, the district court also

failed to evaluate the totality of the evidence—epidemiology, mechanism of action, animal studies and undisputed neurologic effects of the individual solvents—and instead dismissed each type of evidence as if the other did not exist.

Continuing with the same theme, the district court's cursory review of the literature led it to mischaracterize and apply the wrong legal standard to an expert consensus statement issued by the National Institute of Environmental Health Sciences (NIEHS). The NIEHS experts concluded that solvents "likely" contribute to the development of multiple sclerosis, but the district court erroneously found this to fall short of the "more likely than not" standard for causation under Florida law. The court also mischaracterized the NIEHS expert statement as a regulatory standard, when it is not, and assigned it "less weight" based on that mischaracterization.

Finally, the district court placed excessive emphasis on what it called "process problems" regarding how Dr. Kantor gathered and presented the literature supporting his opinion. In so doing, the district court ignored this Court's precedents showing that the focus of a *Daubert* review in a case like this should be directed at whether the scientific evidence supports causation, not whether the expert's report adequately documents his process of gathering the literature.

## I. The district court abused its discretion by not analyzing the epidemiological literature offered by Dr. Kantor to support his opinion.

The district court's "Analysis" section of its decision is approximately nine double-spaced pages, yet less than two of those pages address "the substance of the science"—and so, unsurprisingly, the district court barely scratched the surface of the science.[33] This superficial level of review is not in accord with this Court's precedents showing that a careful analysis of the scientific literature is a vital part of a *Daubert* review.

Consistent with *Daubert*'s flexible standard,[34] this Court has set forth the following "scientifically valid method[] for establishing general causation":

> [W]e will admit expert opinions pursuant to *Daubert* that are supported by epidemiological studies, provided the expert explains how the findings of those studies may be reliably connected to the facts of the particular case.

*Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1196-97 (11th Cir. 2010); *see also id*. at 1198 n.11 (recognizing that an expert may rely "exclusively on medical literature to establish general causation" so long as it "provide[s] enough support").

---

[33] Doc. 230 p. 9-10.

[34] "The inquiry envisioned by Rule 702 is … a flexible one" and "there is no definitive checklist or test." *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593-94 (1993)).

In accordance with *Hendrix*, the district court's inquiry should focus on "[t]he scientific evidence presented by plaintiffs in support of their theory of causation." *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1198 (11th Cir. 2002); *see also Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1314-15 (11th Cir. 1999) (endorsing "a thorough review of the medical evidence" and "a detailed look at the four epidemiological studies" offered by the plaintiff's expert in support of general causation); *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1337 (11th Cir. 2010) (noting that "[t]he district court considered four of these items of literature both separately and in combination" when reviewing a general causation opinion); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 145-46 (1997) (individually analyzing the four epidemiological studies offered by plaintiffs).[35]

Even the district court acknowledged the importance of examining the scientific record. In an earlier order (Doc. 219), the district court determined that it could not rule on general causation without having "the full scientific record before it," and the court indicated that it would "take a deeper look at the individual studies" before ruling on general causation.[36]

---

[35] *See also Hendrix*, 609 F. 3d at 1196-1202 ("We have carefully and exhaustively reviewed the literature…"); *Rider*, 295 F.3d at 1999-1201 ("the district court carefully considered the case reports" and "discussed each of these studies"); *Allison*, 184 F.3d at 1315 (the district court "took a detailed look at the four epidemiological studies Gershwin offered to support his opinion" and compared them "to over twenty other epidemiological studies").

[36] Doc. 219 p. 9, 18.

Nonetheless, in its later order, which is now the subject of this appeal, the district court did not "take a deeper look at the individual studies" as it said it would, and as this Court and the district courts did in *Hendrix*, *Rider*, *Allison*, and *Kilpatrick*. In fact, the district court did not even address one single study by name. The district court's cursory review is even more problematic when considering that Dr. Kantor offered a robust body of published peer-reviewed epidemiological literature, and "[e]pidemiology … is generally considered to be the best evidence of causation in toxic tort actions." *Rider*, 295 F.3d at 1198; *see also Hendrix*, 609 F.3d at 1197 (quoting *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 882 (10th Cir. 2005)) ("[E]pidemiology is the best evidence of general causation in a toxic tort case."). More than once, this Court has described epidemiological studies as "powerful evidence of causation." *See Rider*, 295 F.3d at 1198; *Hendrix*, 609 F.3d at 1196; *see also Chapman v. Procter & Gamble Distribg., LLC*, 766 F.3d 1296, 1308 (11th Cir. 2014) (recognizing epidemiological evidence as one of three methodologies that are "indispensable to proving the effect of an ingested substance").

Had the district court engaged in a careful, individualized analysis of the literature cited by Dr. Kantor, it would have found not only individual cohort and case-control epidemiological studies, but also meta-analyses compiling data from

dozens of other epidemiological studies.[37] This body of literature has been developed over a period of almost 30 years and consistently shows statistically significant associations between solvent exposure and multiple sclerosis. The literature cited by Dr. Kantor includes:[38]

**Landtblom 1996** (Doc. 138-11): a meta-analysis that "review[ed] all currently available studies on MS and solvent exposure," which as of 1996 consisted of "13 published studies concerning solvent exposure and MS," with 10 of the studies indicating "increased risk of multiple sclerosis in relation to solvent exposure." Based on their review, the study authors concluded that "[o]ur evaluation is consistent with the hypothesis that organic solvents may be a cause of multiple sclerosis," and through both pooled analyses and meta-analyses the study authors found relative risk point estimates from 1.7 to 2.6.[39]

**Riise 2002** (Doc. 138-19): an epidemiological study that analyzed cohorts of 11,542 painters, 36,899 construction workers, and 9,314 food-processing workers

---

[37] "The difference between cohort studies and case-control studies is that cohort studies measure and compare the incidence of disease in the exposed and unexposed ('control') groups, while case-control studies measure and compare the frequency of exposure in the group with the disease (the 'cases') and the group without the disease (the 'controls')." *Reference Guide on Epidemiology*, 2011 WL 7724261 at *5. "Meta-analysis is a method of pooling study results to arrive at a single figure to represent the totality of the studies reviewed." *Id*. at *31.

[38] Doc. 58-1 p. 24-26, 29-30.

[39] AM Landtblom et al., *Organic Solvents and Multiple Sclerosis: A Synthesis of the Current Evidence*, 7 Epidemiology 429 (Jul. 1996), Doc. 138-11 p. 1.

and found "[t]he relative risk for painters compared with workers not exposed to organic solvents was 2.0 (95% confidence interval = 0.9-4.5) for MS."[40]

**Barragan-Martinez 2012** (Doc. 138-2): a meta-analysis including 33 epidemiological studies that found a statistically significant association between OS [organic solvent] exposure and increased risks of Multiple Sclerosis (OR 1.53; 95% CI 1.03-2.29). In addition, the reported supplementary analyses showed similar statistically significant increased risks for exposures to individual solvents Mrs. Davis was exposed to, including PCE, TCE, Toluene, and others.[41]

**Hedstrom 2018** (Doc. 138-8): an epidemiological study that analyzed "exposure to organic solvents and MS risk … based on 2,042 cases and 2,947 controls" and found "[a] significant association ... between exposure to organic solvents and increased risk of developing MS." (OR 1.5; 95% CI 1.2-1.8).[42]

**Bostrom 2019** (Doc. 138-4): an epidemiological case-control study involving 1,197 multiple sclerosis patients and 2,361 health controls concluding that

---

[40] T Riise et al., *Organic Solvents and the Risk of Multiple Sclerosis*, 13 Epidemiology 718 (Nov. 2002), Doc. 138-19 p. 1.
[41] C Barragan-Martinez et al., *Organic Solvents as Risk Factor for Autoimmune Diseases: A Systematic Review and Meta-Analysis*, 7 PloS one e51506 (Dec. 2012), Doc. 138-2 pp. 1-2.
[42] AK Hedstrom, *Organic Solvents and MS Susceptibility*, 91 Neurology e455 (Jul. 2018), Doc. 138-8 p. 3.

"[e]xposure to organic solvents was found to be associated with an increased MS risk, OR 1.51 (95% confidence interval (CI): 1.19-1.90…").[43]

**Gerhardsson 2021** (Doc. 138-5): a meta-analysis that analyzed "high-quality studies of workers exposed to organic solvents" and found "a significant association between the development of multiple sclerosis and exposure to organic solvents." Pooled data from all 14 case-control studies gave an OR of 1.44 (95% CI 1.03-1.99).[44]

Every study cited above showed an increased risk of multiple sclerosis resulting from exposure to solvents with an odds ratio or relative risk above 1.0. *See, e.g., In re Zantac (Ranitidine) Prod. Liab. Litig.*, 644 F. Supp. 3d 1075, 1183-84 (S.D. Fla. 2022) ("An odds ratio greater than 1.0 suggests that, when a subject develops a disease or condition, the subject is more likely to have been exposed to the substance of interest. Similarly, a relative risk ratio greater than 1.0 means that a group exposed to a particular agent was more likely to develop a particular disease. By way of example, a relative risk ratio of 1.2 indicates that a group of persons (who were exposed to the agent of interest) had a 20% increased risk of developing a

---

[43] I Bostrom, *Environmental Factors in Multiple Sclerosis, Focusing Exposure to Organic Solvents*, 3 Health Risk Analysis 60 (Sept. 2019), Doc. 138-4 p. 1.
[44] L Gerhardsson, *Work-related Exposure to Organic Solvents and the Risk for Multiple Sclerosis – A Systematic Review*, 94 Int. Arch. Occup. Environ. Health 221 (Feb. 2021), Doc. 138-5 p. 1.

particular disease, when that group was compared to a group of persons who were not exposed to the agent of interest.").

Only the Riise study, which showed a relative risk of 2.0 (i.e., a doubling of the risk), presented a confidence interval that included 1.0 (95% confidence interval = 0.9-4.5), meaning that statistical significance could be called into question. *See, e.g., Zantac*, 644 F. Supp. at 1184 (explaining that "a confidence interval of .96 to 1.24" indicates "that the study author is 95% confident that, once randomness and chance are taken into account, the relative risk … is somewhere between .96 and 1.24" and because this range "spans 1.0 … this is not typically considered (within the scientific community) to be a statistically significant finding").

As discussed in Section V(B), the district court criticized Dr. Kantor for including "statistically insignificant associations"[45] in his report, (presumably referring to Riise), but neglected to acknowledge the statistical significance of numerous other studies, including three meta-analyses pooling data from dozens of additional studies.[46] In so doing, the district court created its own analytical gap by disregarding the foundation of Dr. Kantor's opinion. *See Elosu v. Middlefork Ranch*, 26 F.4th 1017, 1027 (9th Cir. 2022) ("Although the district court properly may

---

[45] Doc. 230 p. 7.
[46] "[T]he widely accepted approach to combining data from multiple studies—thus increasing the power to detect an association—is to conduct a systematic meta-analysis." *See In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, 26 F. Supp. 3d 449, 457 (E.D. Pa. 2014).

exclude expert testimony if the court concludes too great an analytical gap exists between the existing data and the expert's conclusion, ***this gap was of the district court's making***. A court cannot exclude expert testimony for lacking 'sufficient facts or data' while openly disregarding the foundation of the expert's opinion.") (citation omitted and cleaned up) (emphasis added).

Finally, the district court failed to even mention, let alone address, the opinions of Plaintiff's environmental engineer, Dr. Ranajit Sahu.[47] In his report, Dr. Sahu connected the epidemiological studies to the facts of this case consistent with the test for admissibility set forth in *Hendrix*, 609 F.3d at 1196-97:

> I have reviewed the exposure conditions in epidemiological studies of Multiple Sclerosis and organic solvents reviewed by Dr. Kantor (Landtblom 1996; Riise 2002; Bostrom 2019; Hedstrom 2018; Barragan-Martinez 2012; Gerhardsson 2021). These exposure conditions in these studies are qualitatively similar to the occupational exposures Mrs. Davis would have incurred in her employment at Lockheed Martin's SLRC.[48]

This Court has held that a district court abuses its discretion when excluding expert testimony without considering the evidence supporting the opinion. *See United Fire*, 704 F.3d at 1341-42 (holding that the district court abused its discretion

---

[47] Dr. Sahu is an environmental engineer who offered opinions on the exposures suffered by Mrs. Davis. *See* Doc. 159-8. In a different case, this Court found Dr. Sahu's expert testimony reliable and reversed the district court's exclusion. *See U.S. v. Alabama Power Co.*, 730 F.3d 1278, 1288 (11th Cir. 2013).

[48] Doc. 159-8 p. 9; *see also* Doc. 157-7 p. 5 (Dr. Kantor's differential diagnosis incorporating Dr. Sahu's opinions).

when excluding expert testimony because the court failed to consider the evidence supporting the opinion); *Adams*, 760 F.3d at 1328-29 (finding the district court abused its discretion when excluding expert testimony as *ipse dixit* when there was evidence in the record supporting the opinion). Here, as in *United Fire* and *Adams*, the district court abused its discretion because it failed to analyze the robust body of epidemiological evidence supporting Dr. Kantor's opinion.

II.  **The district court abused its discretion by not evaluating additional evidence supporting the theory of causation together with the epidemiological evidence.**

Consistent with *Daubert*'s flexible framework, a court should look to the totality of the evidence offered by an expert when evaluating causation opinions. As one district court in this circuit has explained, even if animal studies, case studies and analogy studies are not reliable "as individual evidence," they may serve as "confirmatory pieces of the totality of the evidence" offered by an expert in support of general causation opinions. *In re Seroquel Prod. Liab. Litig.*, 2009 WL 3806435, at *8-9 (M.D. Fla. June 23, 2009); *see also Siharath v. Sandoz Pharm. Corp.*, 131 F. Supp. 2d 1347, 1370 (N.D. Ga. 2001), *aff'd sub nom. Rider*, 295 F.3d 1194 (endorsing the viewpoint that "the totality of the evidence would be enough to satisfy the demands of *Daubert*" if "there was at least some support for the causal hypothesis in the peer-reviewed epidemiological literature" together with additional secondary evidence such as mechanism of action and animal studies); *Chapman*, 76

F.3d at 1308 (only excluding plausible explanations and animal studies because of the absence of a primary methodology such as epidemiological evidence); *Hendrix*, 609 F.3d at 1197 (explaining that in addition to "admit[ting] expert opinions pursuant to *Daubert* that are supported by epidemiological studies, … [a]n expert's opinion will likely also survive *Daubert* if the expert describes the physiological process, derived by the scientific method, by which a particular cause leads to the development of a given disease or syndrome.").

Here, because Dr. Kantor supported his general causation opinion with epidemiological evidence, his explanation of the mechanism of action and description of animal studies provide further admissible evidence to support his opinion. In his report, Dr. Kantor described the mechanism by which solvents cause multiple sclerosis:

> [G]iven their lipophilic nature, their tendency to target white brain matter and lipid rich areas of the brain, their demonstrated abilities to reduce myelination and inhibit myelin repair, their toxic and destabilizing effects on the immune system, it is more likely than not that exposure to solvent mixtures containing combinations of trichloroethylene, tetrachloroethylene, toluene, xylenes and/or styrene are capable of causing or to the development of MS.[49]

Dr. Kantor supported this opinion with numerous studies demonstrating these effects for each of those specifically identified solvents. At his deposition, Dr. Kantor explained the mechanism of action specific to TCE, PCE, toluene, and xylenes:

---

[49] Doc. 58-1 p. 29.

[Q.] …[C]an you explain the similarities between TCE, PCE, toluene, and xylenes in a general sense?

[A.] Yeah, I think the -- the biggest similarity to think about is the lipophilic nature and how they're going to -- they're almost designed in a way to be absorbed by -- by the brain. The brain becomes like a sponge through its -- through its fatty nature and absorbs these -- absorbs these solvents, these chemicals. Where then the chemicals, the solvents can actually become integrated into -- into the central nervous system itself, into the brain itself, and cause the damage that we discussed.

\*\*\*

…[I]n the case of multiple sclerosis, if you're damaging the myelin and the white matter covering, so the fatty covering of the neurons, of the axons themselves, then your immune system is going to be repeatedly exposed to these fragments of the myelin and your immune system is going to potentially launch an attack on -- on that major source of the myelin, which is not the little pieces that have broken up into the bloodstream, but rather the myelin that's there on the central nervous system itself.[50]

Dr. Kantor then supported his explanation of the mechanism of action with reference to animal studies involving the specific solvents at issue in this case. *See, e.g.,* Doc. 58-3 p. 53 ("Animal experimentation … demonstrated that exposure to many of these solvents could be absorbed … into the brain and … be able to have … an effect in terms of destruction or damage … to the myelin or the covering of the nerves themselves."); Doc. 58-3 p. 29-30 ("I make reference [in my report] to individual compounds, how their -- exposure to them can cause in animals changes that are consistent with the changes that would happen in a human with multiple

---

[50] Doc. 58-3 p. 54.

sclerosis."); Doc. 58-2 p. 2 ("animal models of disease are commonly used to understand the mechanism by which disease occurs in humans").[51]

Finally, Dr. Kantor evaluated each of the five solvents individually and offered evidence that they each target and damage the central nervous system, which is consistent with his explanation of the mechanism of action by which they cause multiple sclerosis.[52] Moreover, these effects are undisputed because even Defendant's expert, Dr. Kenneth Mundt, conceded that solvents at issue target and damage the central nervous system.[53]

The district court barely mentioned this additional evidence that was offered, relegating it to a footnote and stating that "biological plausibility, without more, cannot establish general causation" and that the animal studies "are of little value."[54] But this ignores that all the evidence should be "viewed in the aggregate" together with the epidemiology to obtain a "clearer picture of causation." *Seroquel*, 2009 WL 3806435, at *7. Here, when considering the epidemiology showing a statistically significant association between solvents and multiple sclerosis, together with an explanation of the mechanism of action, which is supported by animal studies and undisputed evidence that the solvents at issue damage the central nervous system in

[51] *See also* Doc. 58-1 p. 6-7, 10, 13-14, 20-21 (discussing specific animal studies).
[52] Doc. 58-1 p. 4-6 (PCE); 8-9 (TCE); 16-18 (toluene); 20-21 (xylenes); 21-22 (styrene); and 31 (summary of neurodegeneration effects).
[53] Doc. 174-1 p. 17 (styrene); 19 (PCE); and 21 (TCE).
[54] Doc. 230 p. 11 fn. 10.

ways that could cause multiple sclerosis, Dr. Kantor's causation opinion meets the test for reliability under Eleventh Circuit case law.

## III. The district court abused its discretion by concluding that only studies limited to the five solvents at issue can be a reliable basis for Dr. Kantor's opinion.

In its ruling, the district court recognized that "the five substances at issue are indeed solvents" but criticized Dr. Kantor because "none of the studies he looked at had solvent mixtures with *only* the five substances at issue."[55] Notably, this is the only issue the district court identified regarding "the substance of the science" underlying Dr. Kantor's general causation opinion, and it represents far too narrow a view of the evidence under this Court's precedents.

As this Court has cautioned, "a methodology based on a review of existing literature" does not need to "rely on articles that draw a direct, concrete, and absolute causal connection" in order to survive *Daubert*. *Kilpatrick*, 613 F.3d at 1341 n.18; *Hendrix*, 609 F.3d at 1198 n.10 (noting that literature does not need to draw a "definitive" causal connection and stating "we agree that *Daubert* does not require certainty"). Instead, "in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Quiet Technology DC–8, Inc. v. Hurel–Dubois UK Ltd.*,

---

[55] Doc. 230 p. 9 (emphasis by court).

326 F.3d 1333, 1345 (11th Cir. 2003) (quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002)).[56]

The inability for literature to draw an "absolute causal connection" is especially pronounced in a case like this where, as Dr. Kantor explained, "[o]ne would not expect a prospective randomized controlled trial of the effects of nontherapeutic chemicals on human patients."[57] *See also U.S. v. Nahmani*, 696 Fed. Appx. 457, 466, 473-74 (11th Cir. 2017) (accepting expert's explanation that "there were no scientific studies using humans to determine the effect of the substances on the human central nervous system because scientists ethically could not run a trial on humans"); *Anderson v. Raymond*, 59 F.4th 279, 285 (7th Cir. 2023) ("An expert hoping to testify about benzene's effects on children need not expose children to benzene."). Even the district court observed that "studying diseases in humans caused by potentially beneficial medicines or drugs is very different than those

---

[56] *See also Milward v. Acuity Specialty Prod. Grp.*, Inc., 639 F.3d 11, 22 (1st Cir. 2011) ("There is an important difference between what is *unreliable* support and what a trier of fact may conclude is *insufficient* support for an expert's conclusion.") (emphasis by Court); *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) ("Lack of certainty is not, for a qualified expert, the same thing as guesswork."); *U.S. v. W.R. Grace*, 504 F.3d 745, 765 (9th Cir. 2007) ("The study's failure to establish causation goes to the weight it should be accorded, but does not mean that an expert could not rely on it in forming an opinion."); *Von Duprin v. Major Holdings*, 12 F.4th 751, 772 (7th Cir. 2021) ("range of confounding variables … goes more to the weight (or lack thereof) the district court should have afforded Dr. Love's ultimate opinions").

[57] Doc. 58-1 p. 3.

caused by toxic chemicals, heavy metals, or solvents not meant to be ingested by humans."[58]

Despite the district court's observation, it nonetheless established an unreasonably rigid standard that could only be met with unethical human trials because epidemiology will likely never exist for individual solvents. *See* Hedstrom 2018, Doc. 138-8 p. 5 ("It is difficult to analyze different solvents separately since most of the solvents are a mixture, and most people cannot specify to what specific agents they have been exposed."); Gerhardsson 2021, Doc. 138-5 p. 2 ("Organic solvents is mostly a mixture of hydrocarbons … which makes it difficult to estimate the effect of single agents").

But even without studies of individual solvents, the epidemiology that exists is remarkably informative as to the five solvents at issue in this case. In the Gerhardsson meta-analysis (finding a statistically significant odds ratio of 1.44), the study authors identified 406 relevant studies and narrowed their analysis down to 14 "high-quality studies of workers exposed to organic solvents," with an emphasis on "refin[ing] the exposure to organic solvents and exclud[ing] other types of exposures."[59] The study authors identified all five solvents at issue in this case (tetrachloroethylene (PCE), trichloroethylene (TCE), toluene, xylene, and styrene)

---

[58] Doc. 219 p. 11 fn. 2.
[59] Doc. 138-5 p. 1-2.

as common solvents in the exposures being studied.[60] *See also* Bostrom 2019, Doc. 138-4 p. 3 (identifying trichloroethylene (TCE), toluene, styrene, and xylene). Further, like the exposures described in the cited epidemiological studies, Mrs. Davis was exposed to a mixture of solvents as opposed to a single compound.[61] Thus, contrary to the district court's conclusion, the solvents at issue have been studied and found to have a statistically significant association with multiple sclerosis, and the studies are connected to the facts of the case through Dr. Sahu's opoinions. Any arguable imprecision in the studies are matters for cross-examination, not a basis for exclusion. *Quiet Tech.*, 326 F.3d at 1345.

In concluding that the epidemiology in this case supports only "a wholly unproven hypothesis," the district court relied on this Court's decisions in *Hendrix* and *Rider*, but those cases involved literature that is very different from what exists here.[62] In *Hendrix*, the Court considered whether traumatic brain injury can cause autism. 609 F.3d at 1199. With no epidemiology in support of general causation, the plaintiff pointed to a chapter in a medical textbook as "the most compelling literature" on causation, and this Court, after "carefully" reading the chapter, "failed to discern any suggestion that brain damage resulting from post-birth traumatic brain

---

[60] Doc. 138-5 p. 2.
[61] Doc. 159-8 p. 8.
[62] Doc. 230 p. 10.

injury can cause autism spectrum disorders." *Id*.; *see id.* at 1200-02 (finding that additional literature failed to draw any causal link between brain injury and autism).

In *Rider*, where the issue was whether the drug Parlodel can cause hemorrhagic strokes, the plaintiff offered three epidemiological studies that "found no relationship or a negative relationship" and "both parties agree[d] that none of the studies present[ed] statistically significant results." 295 F.3d at 1198.

Here, in contrast to *Hendrix* and *Rider*, Plaintiff presents numerous epidemiological studies showing a statistically significant association between solvents and multiple sclerosis, with evidence from multiple studies that included the same solvents at issue in this case. In rejecting the studies, the district court made an "ultimate conclusion[] as to the persuasiveness of the proffered evidence" but "it is not the role of the district court" to make such conclusions. *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (quoting *Quiet Tech.*, 326 F.3d at 1341). While the district court may believe that Dr. Kantor's analysis is flawed for relying on studies that include more than just the five solvents at issue, "[t]he identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination." *Quiet Tech.*, 326 F.3d at 1345.

## IV. The district court abused its discretion by mischaracterizing the NIEHS expert consensus statement and applying the wrong legal standard to it.

In 2010, the National Institute of Environmental Health Sciences (NIEHS) convened an "Expert Panel Workshop to Examine the Role of the Environment in

the Development of Autoimmune Disease."[63] The panel consisted of "an interdisciplinary group of experts from the environmental health science and autoimmune research communities."[64] The experts were asked to "examin[e] the role of the environment in the development of autoimmune disease" by evaluating "molecular mechanisms and receptor dynamics; animal models; and epidemiology/human studies."[65] With respect to multiple sclerosis, the expert panel concluded: "We Consider the Following Likely, but Requiring Confirmation[:] Solvents contribute to development of MS."[66]

In a footnote, the district concluded that Dr. Kantor "goes further than they [the NIEHS experts] are willing to go" because, according to the court, the NIEHS experts "were themselves unwilling to conclude that causation had been proven."[67] In so concluding, the district court failed to appreciate that a "distinction exists between legal sufficiency and scientific certainty." *Wells v. Ortho Pharm. Corp.*, 788 F.2d 741, 745 (11th Cir. 1986) (holding that as long as the legal standard is satisfied "it does not matter in terms of deciding the case that the medical community might require more research and evidence before conclusively resolving the question");

---

[63] Doc. 138-17 p. 3.
[64] Doc. 138-17 p. 3.
[65] Doc. 138-17 p. 3.
[66] Doc. 138-17 p. 13.
[67] Doc. 230 p. 11 fn. 10 (quoting *Huss v. Gayden*, 571 F.3d 442, 459 (5th Cir. 2009)).

*see also In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768, 779 (8th Cir. 2021) ("[I]t was not necessarily unreliable for the experts to rely on McGovern 2011 to draw an inference of causation just because the study itself recognized, consistent with these principles, that the association did not establish causation.").

In this case, the standard of causation is "more likely than not." *Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1069 (11th Cir. 2014) (citing *Gooding v. Univ. Hosp. Bldg.*, 445 So.2d 1015, 1018 (Fla. 1984)). This means that Plaintiff sustains his burden of proof on causation if he shows "that the defendant's negligence 'probably caused' the plaintiff's injury." *Id.* (citing *Cox v. St. Joseph's Hosp.*, 71 So.3d 795 (Fla. 2011)). Thus, under Florida law, the NIEHS expert panel's "likely" finding is reliable evidence for proving causation, even though it requires confirmation to rise to the level of absolute scientific certainty. By applying the incorrect legal standard—something higher than "more likely than not"—the district court necessarily abused its discretion. *Adams*, 760 F.3d at 1331 (holding that "an error of law is necessarily an abuse of discretion" in the context of a *Daubert* review).

The district court also mischaracterized the nature of the NIEHS expert panel when finding that "their conclusions are entitled to less weight given their role in

recommending protective standards" (citing *McClain* and *Williams*).[68] In *McClain*, the Court drew a distinction between "the type of risk assessment that a government agency follows for establishing public health guidelines versus an expert analysis of toxicity and causation in a toxic tort case." 401 F.3d at 1249. In *Williams*, the Court pointed to "the potential methodological perils of relying, at face value, on regulatory emissions levels to establish causation." *Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1247 (11th Cir. 2018).

In contrast, the NIEHS experts were not conducting a risk assessment to propose public health guidelines as in *McClain*, nor were they establishing regulatory emissions levels as in *Williams*. Instead, the experts were brought together "from the environmental health science and autoimmune research communities to review the literature and evaluate the state of the science."[69] The experts' literature review encompassed "mechanisms, animal models, and human studies."[70] At the conclusion of the workshop, the experts simply "reported their findings."[71] Given this description, the NIEHS experts functioned in the same way as an expert analyzing causation in a toxic tort case. By mischaracterizing the NIEHS evidence as regulatory-based and assigning it "less weight" (or, more accurately, *no* weight),

---

[68] Doc. 230 p. 11 fn. 10.
[69] Doc. 138-17 p. 3.
[70] Doc. 138-17 p. 3.
[71] Doc. 138-17 p. 3.

the district court abused its discretion. *Alabama Power Co.*, 730 F.3d at 1284 (finding an abuse of discretion where the district court mischaracterized the nature and applicability of expert evidence).

## V. Dr. Kantor employed a reliable literature review process consistent with Eleventh Circuit precedent.

The district court critiqued Dr. Kantor for so-called "process problems" regarding how Dr. Kantor gathered and presented the literature in his report, in lieu of an analysis by the district court of the literature itself to see if the literature supports Dr. Kantor's opinion.[72] Relying mostly on other lower court decisions, the district court took issue with three aspects of Dr. Kantor's literature review process: (A) that he did not document in his report his weighing of the epidemiological studies;[73] (B) that he included a study in his report showing a statistically insignificant association;[74] and (C) that he did not list negative studies.[75] These "process" issues will be addressed in turn; however, it should be emphasized that these issues have little to do with the critical question of whether the body of

---

[72] As discussed in Argument Section I, the district court's primary focus should be on analyzing the literature, not on the process of gathering and presenting the literature in the expert's report. *See Hendrix*, 609 F.3d at 1196-1202; *Rider*, 295 F.3d at 1198-99; *Allison*, 184 F.3d at 1313-16; *Kilpatrick*, 613 F.3d at 1336-41.
[73] Doc. 230 p. 5-7.
[74] Doc. 230 p. 7-8.
[75] Doc. 230 p. 8-9.

scientific literature supports Dr. Kantor's general causation opinion—a question that the district court largely avoided.

### A. Dr. Kantor reliably selected and weighed the literature.

Dr. Kantor started his analysis by framing the question of whether multiple sclerosis can be caused by any of the chemicals alleged to have been released from Defendant's facility.[76] To answer this question, he reviewed toxicology literature published by government agencies (such as Agency for Toxic Substances and Disease Registry (ATSDR) and Environmental Protection Agency (EPA)), and gathered the source materials cited in that literature.[77] He also searched the National Institutes of Health (NIH) PubMed database for papers published between January 1, 1950 and January 1, 2022, with the search terms "multiple" AND "sclerosis" AND "chemical" AND "exposure."[78] Finally, he gathered additional articles cited as references in the literature he reviewed.[79]

After gathering the literature, he "assessed the scientific rigor and relevance of" the articles, accounting for "study design, study sample size, relevant endpoints included, relative strengths and weaknesses."[80] As he reviewed individual articles,

---

[76] Doc. 58-3 p. 8-9; Doc. 58-2 p. 3. Because Dr. Kantor wrote his general causation reports for multiple related cases, the reports also address other health endpoints such as Parkinson's Disease.
[77] Doc. 58-1 p. 3.
[78] Doc. 58-2 p. 3.
[79] Doc. 58-3 p. 9.
[80] Doc. 58-2 p. 4.

he applied the Bradford Hill criteria to analyze the data.[81] He then weighed the entire body of evidence to identify associations while "considering other possibilities like confounders that could … explain the association."[82]

In its ruling, the district court was mostly unconcerned with the substance of the literature and instead focused on how Dr. Kantor presented the literature in his report. For example, the court acknowledged that Dr. Kantor looked at "design, confounders, biases, and other limitations" in the studies he analyzed, but then criticized him because "he does not actually conduct this categorization in his report."[83] Similarly, the district court acknowledged that Dr. Kantor "used the Bradford Hill factors to analyze these studies" but again criticized him because "Bradford Hill is not even mentioned in his report" (however, as the district court concedes in a footnote, Bradford Hill is discussed in Dr. Kantor's rebuttal report).[84]

The problem with the district court's observations is that Dr. Kantor *did* weigh the relative strengths and weaknesses of the studies, as demonstrated through his deposition testimony and rebuttal report cited above.[85] However, the district court did not accept that evidence, and instead it imposed an unreasonably rigid standard for how an expert must document the literature review process. Even more

---

[81] Doc. 58-2 p. 4; Doc. 58-3 p. 9-10.
[82] Doc. 58-3 p. 10.
[83] Doc. 230 p. 5.
[84] Doc. 230 p. 6.
[85] Doc. 58-2 p. 4; Doc. 58-3 p. 9-10.

problematic, the district court did not follow this Court's binding precedent when the district court imposed these requirements; instead the district court looked to other non-precedential lower court decisions. As explained in Argument Section I, this Court has analyzed expert literature reviews in multiple cases and has never required an expert to detail "Bradford Hill" criteria *in their report* or otherwise required an expert to document a specific process *in their report* for selecting and weighing the studies.[86] Rather, this Court takes a more straightforward approach: it analyzes the substance of the literature in the record to see if it supports the expert's general causation opinion.[87]

The district court relied primarily on *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d 1291 (N.D. Fla. 2018), for its conclusion that an expert's report must document each step of the expert's literature review process, but unlike the district court in this case, the *Abilify* court—in a 130-page opinion—engaged in a thorough analysis of the scientific evidence to determine on a study-by-study basis whether the evidence reliably supported the causation opinion. For example, the court discussed at length the Etminan study and found it "sufficiently reliable to support an expert opinion on general causation." *Id*. at 1313.

---

[86] *See* Doc. 230 p. 6 (concluding that "the report's failures to describe each step of Dr. Kantor's process cast serious doubt on the reliability of his … approach.").
[87] *See Hendrix*, 609 F.3d at 1196-1202; *Rider*, 295 F.3d at 1198-99 (11th Cir. 2002); *Allison*, 184 F.3d at 1313-16; *Kilpatrick*, 613 F.3d at 1336-41.

After finding the Etminan study reliable, the *Abilify* court addressed an argument regarding the reliability of an expert's analysis of the scientific literature. *Id*. at 1351. However, the court found "this challenge is moot" because "the Court has already found that the Etminan Study reliably establishes the requisite association." *Id*. In other words, the *Abilify* court was unwilling to entertain a challenge to the expert's *process* without first evaluating the reliability of *the evidence*. After finding that the cited literature is reliable enough to support a causation opinion, the *Abilify* court declared that challenges based on "process problems" were moot. The same result should follow here. The literature cited by Dr. Kantor is reliable enough to support his causation opinions—indeed, Defendant's experts do not even challenge the reliability of the cited studies.[88]

B. **Where an expert relies on statistically significant studies, a single statistically insignificant study does not render the expert's methodology unreliable.**

The second "process problem" the district court identified was that Dr. Kantor "included statistically insignificant associations" in support of his opinion.[89] But the court did not identify the apparently problematic study by name, nor did it acknowledge that other studies cited by Dr. Kantor show statistically significant associations.[90] However, by turning to the district court's citations, it appears that

---

[88] *See* Doc. 174-3 p. 107-09.
[89] Doc. 230 p. 7.
[90] *See* Doc. 58-1 p. 24-26, 29-30, discussed more fully in Argument Section II.

Riise 2002 (Doc. 138-19) is the study to which the district court refers.[91] Riise is one of the earlier studies of the association between solvents and multiple sclerosis and it found a statistically significant relative risk of 2.0 for exposed workers, concluding that "[t]hese results are compatible with the hypothesis of organic solvents being a possible risk factor for MS."[92] While the results of this study are less than statistically significant (95% CI = 0.9-4.5), that does not mean that the study must be disregarded in its entirety or that the study necessarily refutes other studies with statistically significant findings.[93]

More to the "process problem" at hand, the district court's ruling raises the question of whether an expert's methodology is unreliable simply because he cites a single study with borderline statistical significance together with other studies showing statistical significance. The answer is a resounding no. *See e.g., Hardeman v. Monsanto*, 997 F.3d 941, 963 (9th Cir. 2021) (rejecting argument that expert should have placed more weight on a particular study); *Schultz v. Akzo Nobel Paints*, 721 F.3d 426, 433 (7th Cir. 2013) ("Rule 702 did not require, or even permit, the

---

[91] Doc. 230 p. 7 (citing Doc. 58-3). Of the four pinpoint cites listed by the district court, only Doc. 58-3 p. 32 (transcript pages 122:4-125:15) refers to a specific study, which is Riise 2002, Doc. 138-19.
[92] Doc. 138-19 p. 1. *See also Allison*, 184 F.3d at 1315 fn.16 ("Risks greater than 2.0 permit an inference that the plaintiff's disease was more likely than not caused by the agent.").
[93] Doc. 58-3 p. 32 (Q. "What does it mean if the 95 percent confidence interval includes 1.0?" A. "It means that your results are suggestive but not definitive.")

district court to choose between those two studies at the gatekeeping stage.");
*Ambrosini v. Labarraque*, 101 F.3d 129, 138 (D.C. Cir. 1996) (finding expert opinion admissible because "[w]hile some studies suggest no causal relationship between Depo–Provera and the types of birth defects suffered by Teresa, others suggest a positive one."); *Glaser v. Thompson Med*, 32 F.3d 969, 975 (6th Cir. 1994) ("[T]here are other studies that disagree with Dr. Zaloga's conclusion. … Such differences in opinions among medical experts do not invalidate Dr. Zaloga's opinion…").

Consistent with these cases, Dr. Kantor explained at his deposition:

Q.    Okay. Do you agree that an association identified in the literature must be statistically significant in order to support a cause-and-effect relationship?

A.    No, I think that -- that an association that is not statistically significant but is then confirmed by other authors and other studies and has biological possibility does not necessarily have to be statistically significant to contribute to our understanding.[94]

By failing to consider that the Riise study is one of several studies cited by Dr. Kantor, the district court's reliance on *Allison* is misplaced.[95] In *Allison*, unlike the district court, this Court individually analyzed all four epidemiological studies offered by the plaintiff's expert. *Allison*, 184 F.3d at 1315. Only after finding three

---

[94] Doc. 58-3 p. 19. *See also* Doc. 58-3 p. 17 (explaining with regard to the Riise study, "where something is trending, for example, towards statistical significance but doesn't have it, I think is still informative. It still helps us in understanding in -- not in one paper alone, but in combination with other work.").
[95] Doc. 230 p. 7 (citing *Allison*, 184 F.3d at 1315).

studies statistically insignificant or irrelevant, did the Court determine that the fourth study had a relative risk "so significantly close to 1.0" that it could not serve as the basis for proving causation. *Id*. Here, had the district court individually evaluated the studies, it would have found that Riise 2002 shows a relative risk of 2.0 and that later studies confirmed statistical significance, as discussed in more detail in Argument Section I. However, as a matter of process, Dr. Kantor's inclusion of the Riise study in his report does not render his opinions unreliable.

### C.    Listing negative studies in a report is not a prerequisite to reliability.

Without citing any precedent from this Court, the district court imposed a requirement that an expert list "negative studies" in his report, defined by the court as "those showing a lack of association between substance and disease."[96] However, the district court did not identify any studies that Dr. Kantor failed to address, and instead only speculated that "there are apparently [negative] studies out there" based on some broad testimony by Dr. Kantor about how he generally would address negative studies.[97] But the Court's speculation is belied by the fact that Defendant's experts could not identify a single relevant study that Dr. Kantor failed to include in his analysis.[98] And because the district court did not seem to review the studies that

---

[96] Doc. 230 p. 8.
[97] Doc. 230 p. 8.
[98] *See, e.g.*, Doc. 174-3 p. 107 (Q. "And you haven't identified any specific studies that Dr. Kantor should have reviewed, but did not, have you?" A. I do not…").

*were* cited by Dr. Kantor, it had no context for the universe of studies "out there." For example, the district court is likely unaware that there are hundreds of potentially relevant studies as demonstrated in the Gerhardsson meta-analysis.[99] So, as explained by Dr. Kantor, while "one couldn't expect to describe [in a report] every negative result to a question that you're trying to explore,"[100] Dr. Kantor's reliance on numerous meta-analyses and systematic reviews appropriately incorporates the totality of the relevant evidence on this topic.

The district court relied on a Third Circuit case, *In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, 858 F.3d 787, 799-800 (3d Cir. 2017), for the idea that an expert should "sufficiently discredit[] other studies that found no association or a negative association,"[101] but the court missed an important distinction. The *Zoloft* Court was referring to specific studies **in the record** that presented contrary results and which the expert failed to "sufficiently discredit." *See id.* (comparing the results of the Furu study against the Pederson, Jiminez-Solem, and Kornum studies). In contrast to *Zoloft*, the district court did not refer to any specific studies that Dr. Kantor failed to address but simply speculated that negative studies might exist. As such, the district court based its decision on speculation about what was ***not*** in the

---

[99] *See* Gerhardsson 2021, Doc. 138-5 p. 2 (initially identifying 406 articles relevant to the question of whether solvents can cause multiple sclerosis).
[100] Doc. 58-3 p. 17.
[101] Doc. 230 p. 9.

record, as opposed to the evidence that *was* in the record. This is an abuse of discretion. *United Fire*, 704 F.3d at 1341-42 (reversing exclusion of expert testimony because the district court had failed to consider the evidence supporting the opinion).

## CONCLUSION

The overarching problem with the district court's decision is that the court dedicated only about two pages and a footnote toward evaluating a large body of scientific literature supporting Dr. Kantor's general causation opinion. This is woefully inadequate when compared against any of this Court's precedents analyzing similar general causation expert opinions under the *Daubert* framework. When the literature in this case is properly evaluated, it is evident that Dr. Kantor's general causation opinion has more than enough support to satisfy the reliability requirement under *Daubert* and this Court's precedent. As a result, Plaintiff respectfully requests an order from this Court reversing the district court's decision to exclude Drs. Kantor and Kendall and reversing the district court's summary judgment decision that rests solely on the exclusion of the experts.

Dated: February 20, 2024                    Respectfully submitted,

Josh Autry                                  Rene F. Rocha
Morgan & Morgan                             Morgan & Morgan
333 W Vine St, Ste 1200                     400 Poydras St, Ste 1515
Lexington, KY 40507                         New Orleans, LA 70130
859-899-8785                                954-318-0268
jautry@forthepeople.com                     rrocha@forthepeople.com

Adam P. Bergeron
Morgan & Morgan
47 Maple St, Ste 104D
Burlington, VT 05401
407-974-2075
adambergeron@forthepeople.com

*Attorneys for Appellant Michael Davis*

CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(i)

because, excluding the parts exempted by Fed. R. App. P. 32(f), this brief contains

9,781 words.

*/s/ Adam P. Bergeron*