IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

CASE NO. 24-10080

---

MICHAEL DAVIS,

*Plaintiff-Appellant,*

v.

LOCKHEED MARTIN CORPORATION,

*Defendant-Appellee.*

---

BRIEF OF DEFENDANT-APPELLEE,
LOCKHEED MARTIN CORPORATION

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

---

David B. Weinstein
Ryan Hopper
Irina Khasin
Christopher R. White
Jennifer M. Faggion
GREENBERG TRAURIG, P.A.
101 East Kennedy Boulevard, Suite 1900
Tampa, Florida 33602
Telephone: 813.318.5700
weinsteind@gtlaw.com
hopperr@gtlaw.com
irina.khasin@gtlaw.com
whitech@gtlaw.com
jennifer.faggion@gtlaw.com

Brigid F. Cech Samole
GREENBERG TRAURIG, P.A.
333 S.E. Second Avenue, Suite 4400
Miami, Florida 33131
Telephone: 305.579.0500
cechsamoleb@gtlaw.com
miamiappellateservice@gtlaw.com

*Counsel for Defendant-Appellee, Lockheed Martin Corporation*

## *MICHAEL DAVIS V. LOCKHEED MARTIN CORPORATION*
### CASE NO. 24-10080

## CERTIFICATE OF INTERESTED PERSONS AND
## <u>CORPORATE DISCLOSURE STATEMENT</u>

Defendant-Appellee, Lockheed Martin Corporation, submits this list, which includes the trial judge, and all attorneys, persons associations of persons, firms, partnerships or corporations that have an interest in the outcome of this review:

1. Albanis, Panagiotis V. (Counsel for Plaintiff-Appellant)

2. Appel, Marie N. (Counsel for Plaintiff-Appellant)

3. Autry, Josh (Counsel for Plaintiff-Appellant)

4. Bergeron, Adam (Counsel for Plaintiff-Appellant)

5. Cech Samole, Brigid F. (Counsel for Defendant-Appellee)

6. Citera, Francis A. (Counsel for Defendant-Appellee)

7. Dalton, Jr., The Honorable Roy B. (District Court Judge)

8. Davis, Michael (Plaintiff-Appellant)

9. Faggion, Jennifer (Counsel for Defendant-Appellee)

10. Goldrosen, Eitan (Counsel for Plaintiff-Appellant)

11. Greenberg Traurig, LLP (Counsel for Defendant-Appellee)

12. Greenberg Traurig, P.A. (Counsel for Defendant-Appellee)

13. Hopper, Ryan T. (Counsel for Defendant-Appellee)

14. Irick, The Honorable Daniel C. (District Court Magistrate Judge)

**CERTIFICATE OF INTERESTED PERSONS AND
<u>CORPORATE DISCLOSURE STATEMENT</u>**
**(Continued)**

15. Jackson, Raymond D. (Counsel for Defendant-Appellee)

16. Jarecki, Shawn K. (Counsel for Plaintiff-Appellant)

17. Khasin, Irina (Counsel for Defendant-Appellee)

18. Law Office of Adam Bergeron (Counsel for Plaintiff-Appellant)

19. Miller, Gretchen N. (Counsel for Defendant-Appellee)

20. Moore, Joshua D. (Counsel for Plaintiff-Appellant)

21. Morgan & Morgan, P.A. (Counsel for Plaintiff-Appellant)

22. Morgan, Timothy M. (Counsel for Plaintiff-Appellant)

23. Petosa, Frank M. (Counsel for Plaintiff-Appellant)

24. Porter, Brian C. (Counsel for Defendant-Appellee)

25. Ram, Michael F. (Counsel for Plaintiff-Appellant)

26. Rocha, III, Rene F. (Counsel for Plaintiff-Appellant)

27. Torres, Christopher (Counsel for Defendant-Appellee)

28. Weinstein, David B. (Counsel for Defendant-Appellee)

29. White, Christopher R. (Counsel for Defendant-Appellee)

30. Winn, Jennifer N. (Counsel for Plaintiff-Appellant)

**CERTIFICATE OF INTERESTED PERSONS AND
<u>CORPORATE DISCLOSURE STATEMENT</u>
(Continued)**

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, Defendant-Appellee, Lockheed Martin Corporation, make the following statement as to corporate ownership:

Defendant-Appellee, Lockheed Martin Corporation, hereby discloses that it is a company headquartered in North Bethesda, Maryland, and that no publicly held corporation owns 10% or more of its stock.

   /s/ *David Weinstein*   
David B. Weinstein

## STATEMENT REGARDING ORAL ARGUMENT

Because the issues raised by Appellant can be addressed on the briefs, the record, and governing case law, Appellee submits that oral argument would not be of material benefit to the Court.

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ..............................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................................ i

TABLE OF CONTENTS....................................................................................... ii

TABLE OF CITATIONS ..................................................................................... iv

STATEMENT OF JURISDICTION......................................................................1

STATEMENT OF THE CASE...............................................................................1

I.    Statement of the Facts, Course of Proceedings, and Disposition Below ........2

II.   Scope and Standards of Review ....................................................................6

SUMMARY OF ARGUMENT ..............................................................................7

ARGUMENT ..........................................................................................................9

I.    THE DISTRICT COURT CORRECTLY EXCLUDED DR. KANTOR'S GENERAL CAUSATION TESTIMONY AND GRANTED SUMMARY JUDGMENT FOR LOCKHEED MARTIN. ........9

   A. In focusing on Dr. Kantor's testimony and expert report, the District Court appropriately exercised its "broad latitude" in deciding *how* to determine reliability. ...................................................................................................9

   B. Dr. Kantor failed to reliably establish epidemiological *associations* between exposures to PCE, TCE, and styrene and the development of MS................14

   C. Appellant failed to demonstrate that Dr. Kantor reliably weighed the epidemiological evidence and considered the Bradford Hill criteria, which are essential to parsing causation from association. ......................................25

   D. The District Court correctly analyzed and appropriately discounted Dr. Kantor's "secondary" causation evidence, including his cited publications from NIEHS. ...............................................................................................34

E.  Because Dr. Kantor's general causation testimony was inadmissible, summary judgment was appropriate. ............................................................39

II.  ANY ERROR IN EXCLUDING DR. KANTOR'S GENERAL CAUSATION TESTIMONY WOULD HAVE BEEN HARMLESS BECAUSE HIS SPECIFIC CAUSATION OPINIONS WERE FACIALLY UNRELIABLE. ........................................................................40

CONCLUSION ...........................................................................................50

CERTIFICATE OF COMPLIANCE .......................................................51

CERTIFICATE OF SERVICE ..................................................................51

# TABLE OF CITATIONS

**Page(s)**

## Cases

*In re Abilify (Aripiprazole) Prods. Liab. Litig.*,
  299 F. Supp. 3d 1291 (N.D. Fla. 2018) ............................................................30

*\*Allison v. McGhan Med. Corp.*,
  184 F.3d 1300 (11th Cir. 1999) ......................................................12, 32, 33, 46

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  137 F. Supp. 2d 147 (E.D.N.Y. 2001) .............................................................20

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002) ......................................................................20, 21

*Chapman v. Procter & Gamble Distributing, LLC*,
  766 F.3d 1296 (11th Cir. 2014) ..................................................14, 15, 22, 35, 44

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)........................... 3, 4, 5, 6, 10, 12, 17, 19, 22, 31, 36, 46, 48

*LeBlanc ex rel. Estate of LeBlanc v. Chevron USA, Inc.*,
  396 F. App'x 94 (5th Cir. 2010) ..................................................................35, 36

*\*Hendrix ex rel. G.P. v. Evenflo Co., Inc.*,
  609 F.3d 1183 (11th Cir. 2010) .......................................... 13, 27, 29, 38, 39, 43

*Guinn v. Astrazeneca Pharmaceuticals LP*,
  602 F.3d 1245 (11th Cir. 2010) ..............................................................21, 40, 48

*\*Kilpatrick v. Breg, Inc.*,
  613 F.3d 1329 (11th Cir. 2010) .......................... 6, 11, 12, 13, 15, 22, 31, 32, 39

*\*Knight v. Kirby Inland Marine Inc.*,
  482 F.3d 347 (5th Cir. 2007) ............................................. 20, 21, 33, 40, 41, 49

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999).........................................................................6, 10, 14, 15

*McClain v. Metabolife Int'l., Inc.*,
  401 F.3d 1233 (11th Cir. 2005) .... 4, 5, 14, 16, 17, 19, 20, 21, 23, 30, 38, 42, 45, 46, 49

*Moore v. Ashland Chem. Inc.*,
  151 F.3d 269 (5th Cir. 1998) ....................................................................36, 46

*Pinares v. Raytheon Techs. Corp.*,
  No. 19-14831, 2023 WL 2661521 (11th Cir. Mar. 28, 2023) ...............42, 44, 46

*Rider v. Sandoz Pharm. Corp.*,
  295 F.3d 1194 (11th Cir. 2002) ..................................... 12, 13, 16, 17, 19, 21, 31

*United States v. Cameron*,
  907 F.2d 1051 (11th Cir. 1990) .....................................................................7, 40

*Williams v. Mosaic Fertilizer, LLC*,
  889 F.3d 1239 (11th Cir. 2018) ......................................... 10, 32, 42, 43, 44, 47

*In re Zoloft (Sertraline Hydrochloride) Products Liab. Litig.*,
  858 F.3d 787 (3d Cir. 2017) ........................................................................26, 27

**Statutes**

28 U.S.C. § 1291 ...........................................................................................................1

**Other Authorities**

Fed. R. Civ. P. 1 ........................................................................................................11

Fed. R. Civ. P. 26(a)(2)(B)(i)....................................................................................31

Fed. R. Evid. 104(a) .............................................................................................8, 11, 30

Fed. R. Evid. 702 ......................................................................6, 8, 11, 22, 30, 31

Michael D. Green et al., Reference Guide on Epidemiology,
  REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 392 (Federal
  Judicial Center, 2d ed. 2000) ............................................. 14, 15, 18, 26, 27, 47

## STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because this is an appeal from a final judgment of the U.S. District Court for the Middle District of Florida.

Judgment was entered on December 12, 2023, and Appellant filed a timely notice of appeal on January 9, 2024.

## STATEMENT OF THE CASE

This is a toxic-tort case. Appellant claims that his wife, Carol Davis, developed multiple sclerosis (MS) and passed away as a result of alleged exposures to three industrial solvents: perchloroethylene (PCE), trichloroethylene (TCE), and styrene.

But the cause of MS is unknown. Nevertheless, Appellant proffered expert testimony from a neurologist named Dr. Daniel Kantor, who intended to opine that Mrs. Davis's claimed exposures probably could have caused her MS and probably did, in fact, do so. Dr. Kantor based those opinions primarily on epidemiological studies that investigated "solvents" or "organic solvents" as a class.

The District Court, however, correctly concluded that there are many distinct types of organic solvents, and Appellant failed to demonstrate that studies of solvents generally can establish valid associations—let alone cause-and-effect relationships—between the three specific solvents at issue and the development of

MS. The District Court identified other methodological flaws in Dr. Kantor's opinions as well, and it consequently excluded his general causation testimony as unreliable. Because Dr. Kantor's testimony was essential to Appellant's claims, the Court then granted summary judgment for Lockheed Martin.

Appellant now contends that the District Court must have overlooked or failed to appreciate Dr. Kantor's cited epidemiology. Because the District Court focused in its final order on Dr. Kantor's expert reports and deposition testimony, Appellant incorrectly infers that the studies themselves must have gone unreviewed. But there is no basis for believing the District Court ignored the scientific record. And more importantly, Dr. Kantor's expert reports and deposition admissions more than sufficed to establish the unreliability of his opinions.

The District Court acted well within the considerable leeway afforded to it when deciding how to assess reliability and correctly excluded Dr. Kantor's general causation opinions based upon its assessment. And even if the Court had erred (which it did not), the error would have been harmless because of critical flaws in Dr. Kantor's specific-causation opinions. The judgment below should be affirmed.

## I. Statement of the Facts, Course of Proceedings, and Disposition Below

Appellant Michael Davis filed this negligence and strict-liability action on behalf of himself and the estate of his deceased spouse, Carol Davis. (App. Vol. 1, Doc. 8 ¶¶ 17–18.) Mrs. Davis worked for Lockheed Martin from 1981 until 2001,

mostly at the company's Sand Lake Road Complex (SLRC) in Orlando, Florida. (*See id.* ¶107.) According to Appellant, Mrs. Davis was occupationally exposed to various substances at SLRC, which he believes caused Mrs. Davis to develop MS. (*Id.*) Mrs. Davis passed away in 2020. (*Id.*)

The Court imposed staggered deadlines for *Daubert* and dispositive motions. (Supp. App. Doc. 38 at 2.) Motions concerning general causation were due first, followed by motions on specific causation. (*See id.*)

Appellant initially alleged that Mrs. Davis was exposed to 36 different substances. (App. Vol. 1, Doc. 8 ¶¶ 36–80, 107.) Near the close of the general causation stage, however, Appellant proffered expert opinions from Dr. Kantor to the effect that MS can likely be caused by five specific solvents (or mixtures of five solvents): PCE, TCE, styrene, toluene, and xylene. (App. Vol. 1, Doc. 58-1.) After serving its own expert reports (e.g., Supp. App. Docs. 72-1, 74-1), receiving Dr. Kantor's rebuttal expert report (App. Vol. 1, Doc. 58-2), and taking his deposition (App. Vol. 2, Doc. 58-3), Lockheed Martin filed a motion to exclude Dr. Kantor's general-causation opinions (Supp. App. Doc. 60) and a corresponding motion for summary judgment (Supp. App. Doc. 71). The thrust of Lockheed Martin's motions was that Dr. Kantor had attempted no background risk assessment and had failed to substantiate his opinions through reliable dose-response or epidemiological analyses. (*See* Supp. App. Docs. 60, 71.) Appellant filed his own general-causation

motions, most notably a motion for partial summary judgment asking the District Court to deem this a "category one" case under *McClain v. Metabolife Int'l., Inc.*, 401 F.3d 1233, 1239 (11th Cir. 2005), and to refrain from conducting a full *Daubert* inquiry. (*See* Supp. App. Docs. 63, 80.)

The District Court held a hearing on the general causation *Daubert* and summary judgment issues (Doc. 147), after which the parties proceeded through the specific-causation stage of the case while the Court considered the pending motions. At the specific causation stage, Dr. Kantor submitted a second round of expert reports. (App. Vol. 4 Doc. 157-7; Supp. App. Doc. 157-8.) In these, he narrowed his opinions further to address only PCE, TCE, and styrene, opining that exposure to those three substances or mixtures of them probably caused Mrs. Davis's MS. (*See id.*) Dr. Kantor relied in part on an expert report submitted by Appellant's retained environmental engineer, Dr. Ranajit Sahu, who opined that Mrs. Davis would have experienced "qualitatively" similar exposures to those experienced by the subjects of epidemiological studies cited in Dr. Kantor's general and specific causation reports. (Supp. App. Doc. 157-13.) After another deposition of Dr. Kantor (Supp. App. Doc. 162-1) and a deposition of Dr. Sahu (*see* Supp. App. Doc. 162-3), Lockheed Martin moved to exclude Dr. Kantor's specific causation opinions (Supp. App. Doc. 170).

The District Court then issued an interim order determining that the substance-response relationships alleged in this case fall into *McClain* "category two" and thus required a full-scale *Daubert* review. (*See* App. Vol 6, Doc. 219 at 3–8.) The District Court also rejected Lockheed Martin's arguments that dose-response and other "fit" issues alone required summary judgment. (*See id.* at 9–17.) It took all remaining issues under advisement, electing to resolve the pending causation motions on the full scientific record. (*Id.* at 19–20.) The Court granted the parties leave to submit supplemental briefing (*id.*) and both parties did so (Supp. App. Docs. 222, 223).

A few months later, the District Court issued its final order in which it granted Lockheed Martin's motion to exclude Dr. Kantor's general causation testimony and consequently granted summary judgment for Lockheed Martin (App. Vol. 6, Doc. 230). In sum, the Court concluded that Dr. Kantor's general-causation opinions lacked reliable epidemiological bases for several reasons, including Dr. Kantor's failures to adequately explain his "weight of the evidence" and Bradford Hill analyses (which, in turn, meant that he failed to demonstrate those analyses' reliability) as well as his misplaced reliance on studies of organic solvents as a class, which the District Court concluded could not support his opinions on solvent-specific relationships. (*See id.*)

The Court then entered final judgment in favor of Lockheed Martin (App. Vol. 6, Doc. 231), and this appeal followed (Supp. App. Doc. 232).

## II.    Scope and Standards of Review

Appellant does not contest that an affirmance of the District Court's decision to exclude Dr. Kantor's testimony would require affirmance of the summary judgment entered for Lockheed Martin.  (*See* Appellant's Br. at 10–11.)  This appeal thus principally requires review of the District Court's exclusion of Dr. Kantor's testimony under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

As explained in *Kilpatrick*,

> This Court reviews a trial court's decision to exclude an expert's testimony pursuant to *Daubert* under an abuse of discretion standard. This standard of review requires that [the Court] defer to the district court's ruling unless it is manifestly erroneous.  Because the task of evaluating the reliability of expert testimony is uniquely entrusted to the district court under *Daubert* . . . [the Court gives] the district court considerable leeway in the execution of its duty.

*Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1334–35 (11th Cir. 2010).    This "considerable leeway" means that the "trial court must have the same kind of latitude in deciding *how* to test an expert's reliability . . . as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable."   *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

This appeal could also require review of the summary judgment for Lockheed Martin under a harmless error standard. "A showing that the district court erred or abused its discretion in excluding evidence does not lead automatically to a reversal." *United States v. Cameron*, 907 F.2d 1051, 1059 (11th Cir. 1990). "Such orders will not be disturbed except upon a showing of abuse of discretion, and then *only upon a showing that such abuse of discretion resulted in substantial harm* to the party seeking relief." *Id.* (cleaned up). The party asserting error bears the burden of proving that the exclusion affected "substantial rights." *See id.* (citation omitted).

## SUMMARY OF ARGUMENT

The District Court correctly and appropriately exercised its discretion in excluding Dr. Kantor's general causation opinions.

Contrary to Appellant's arguments in Section I of his brief, there is no reason to believe that the District Court overlooked any epidemiological studies. But even if it had, Dr. Kantor's deposition admissions and expert reports on their own justify exclusion of his general causation opinions. Precedent from this Circuit and the U.S. Supreme Court confirm that the District Court's broad latitude in determining *how* to assess reliability includes the option to rely on testimony alone when it evinces unreliability.

Further, the District Court correctly identified the fundamental epidemiological flaw in Dr. Kantor's general-causation opinions: associations with

solvents as a class, or with solvents to which Mrs. Davis did not claim exposure, are not translatable to PCE, TCE, and styrene specifically. Dr. Kantor's opinions otherwise amount to an unreliable chemical analogy. And his wholesale failures to explain his "weight of the evidence" and Bradford Hill analyses left Appellant unable or unwilling to "demonstrate" the reliability of Dr. Kantor's opinions, as required by Federal Rules of Evidence 702 and 104(a). For these reasons, the arguments in Section III and V of Appellant's brief should be rejected.

With no remaining "primary" methodologies, Dr. Kantor's "secondary" methodologies—including his reliance on his cited National Institute of Environmental Health Sciences (NIEHS) publications—are insufficient to establish general causation. The District Court could have ignored these methodologies entirely, but the secondary methodology review it instead undertook was correct and reflected no manifest error of judgment. Argument Sections II and IV of Appellant's brief are therefore unavailing.

Finally, even if the Court had erred in excluding Dr. Kantor's general causation opinions (which it did not), the error would have been harmless. Appellant relied on Dr. Kantor for both general and specific causation, the full scientific record was before the District Court, and that record confirms that Dr. Kantor fell far short of meeting this Circuit's well-established dose-response requirements for reliable specific causation testimony. Dr. Kantor admitted that if he were correct about PCE,

TCE, and styrene being capable of causing MS, the risk those substances pose would depend on the dose of an exposure.  Yet neither he nor Dr. Sahu could estimate the doses to which Mrs. Davis was allegedly exposed, nor could he estimate doses that would begin to pose appreciable risks of MS.  Dr. Kantor's specific causation opinions thus reduce to unscientific speculation, meaning they too would not have been admissible and thus summary judgment would necessarily have been warranted for Lockheed Martin.

For all of these reasons, the judgment below should be affirmed.

## ARGUMENT

I. **THE DISTRICT COURT CORRECTLY EXCLUDED DR. KANTOR'S GENERAL CAUSATION TESTIMONY AND GRANTED SUMMARY JUDGMENT FOR LOCKHEED MARTIN.**

A. **In focusing on Dr. Kantor's testimony and expert report, the District Court appropriately exercised its "broad latitude" in deciding *how* to determine reliability.**

The "crux of this appeal" is Appellant's allegation that "the district court did not analyze the scientific literature offered by Dr. Kantor in support of his general causation opinion[s]."  (Appellant's Br. at 11.)  But embedded within that allegation—and rippling throughout Appellant's brief—are two essential and unsupportable premises: (1) that the District Court was itself required to analyze the studies (as opposed to analyzing Dr. Kantor's expert reports and deposition testimony); and (2) that not "mentioning" studies "by name" in an order means that those studies went unanalyzed.

To start, Appellant's core contention—that the District Court's review of Dr. Kantor's opinions *required* a direct review of his cited studies and an exposition of the causal inferences they can or cannot support—is irreconcilable with district courts' "'considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" *Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1244–45 (11th Cir. 2018) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). "[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 142.

This "broad latitude" is why this Circuit, to Lockheed Martin's knowledge, has never imposed the analytical constraints for which Appellant argues. A study-by-study analysis and corresponding exposition is *one* way to analyze the reliability of an expert opinion grounded in scientific literature. But it is far from the *only* way, and there are cases in which that approach is unworkable and unnecessary.[1] Indeed,

---

[1] The sheer volume of materials before the District Court in this case alone warrants emphasis. By the close of the case, the parties had filed fifteen *Daubert* motions directed to testimony from eleven experts whose reports, source materials, and deposition testimony spanned thousands of pages. (*See* App. Vol. 6, Doc. 230 at 1 (citing Docs. 60, 61, 63, 65, 67, 69, 71, 164, 170, 171, 173, 175, 177, 179, 181, 183–85).) This was all for one plaintiff.

But this is not a standalone case. It is closely related to several other cases filed by Appellant's counsel on behalf of more than sixty plaintiffs. The injuries alleged in the companion cases are wide-ranging, as are the exposure allegations. So for Appellant to now argue that the District Court, faced with an immense volume of scientifically myriad opinions and materials, was *required* to discharge its *Daubert*

this Circuit has already made clear that an expert's *testimony* about scientific literature can evince unreliability "by itself." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1340 (11th Cir. 2010) ("Dr. Poehling's *admission* that the literature is speculative in nature is *by itself sufficient* to warrant a finding of unreliability." (emphasis added)).

Although the District Court was not required to conduct a study-by-study analysis to assess reliability, its order demonstrates that *none* of the studies Appellant highlights in this appeal were overlooked below. Appellant omits that the District Court cited deposition testimony in which Dr. Kantor directly addressed limitations of *every one* of the allegedly ignored studies. (*See, e.g.*, App. Vol. 6., Doc. 230 at 11 n.9 (citing Doc. 58-3 at 122:4–124:6 (discussing Riise 2002), 134:20–135:12 (Hedstrom 2018), 138:16–139:20 (Gerhardsson 2021), 142:20–143:24 (Bostrom 2019), 146:8–147:22 (Landtblom 1996), 148:1–150:21 (Barragan-Martinez 2012)).) Appellant also omits that the District Court repeatedly cited Lockheed Martin's supplemental "global causation" briefing (*id.* at 1–2 (citing Doc. 222))—which was almost entirely dedicated to analyzing the allegedly ignored studies, complete with quotations from and citations to both the studies themselves and Dr. Kantor's corresponding testimony (Supp. App. Doc. 222 at 2–6 & nn. 2–10). In this same

---

gatekeeping duties through written analyses of all cited literature—a task Appellant's own experts did not attempt—belies credulity. The goal of "just, speedy, and inexpensive" determinations embodied in Federal Rule of Civil Procedure 1 all but requires a more efficient approach, and Federal Rules of Evidence 104(a) and 702 allow it.

vein, Appellant downplays the full-day *Daubert* and summary judgment hearing referenced in the District Court's order (App. Vol. 6, Doc. 230 at 2 (citing Doc. 147)), after which the parties made supplemental submissions that included not only the studies at issue in this appeal, but also summary tables of the studies' strengths and weaknesses from the parties' perspectives as well as Dr. Kantor's corresponding testimony (Supp. App. Docs. 120, 136–38).

That the District Court's final *Daubert* and summary judgment order focused on Dr. Kantor's deposition testimony and reports does not mean that the District Court ignored the rest of the scientific record. Indeed, the cases Appellant mischaracterizes as requiring a written analysis of "the substance of the literature in the record" (*see* Appellant's Br. at 15) actually confirm that the absence of a citation to a study does not support an inference that the study went overlooked. *See Kilpatrick*, 613 F.3d at 1341 n.17 (reasoning that the fact that the district court "did not specifically identify [a] study in its order" did not make it "clear that the district court ignored the . . . study," and that, "in any event, the district court did not abuse its discretion"); *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1196 (11th Cir. 2002) (rejecting the appellants' argument that the district court "misunderstood" and "overlooked critical evidence," and inferring that the district court considered all relevant evidence, "whether or not specifically mentioned in the opinion"); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1316 (11th Cir. 1999) (rejecting the

appellant's allegation that "the district court failed to consider" testimony that it "did not specifically single out [in its order] for comment," and concluding that the court's "global conclusions" on the expert's testimony were reasonable); *cf. Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1188 (11th Cir. 2010) (affirming admissibility assessments based on testimony and expert reports).

The better presumption is that where, as here, a district court states it has reviewed a scientific record, there is no reason to believe the court did not actually perform the review. (*See* App. Vol. 6, Doc. 230 at 5 (stating that the District Court reached its decision from "a review of the record")); *Rider*, 295 F.3d at 1203 (concluding that, where a district court had "stated in its opinion" that the full record had been reviewed, there was "no reason to believe that the district court did not examine the entire record").

Here, there is good reason to believe that the District Court read and analyzed the key studies in the record. But it is also undeniable that the District Court identified critical flaws in Dr. Kantor's opinions through his deposition testimony and reports. (*See* App. Vol. 6, Doc. 230 at 5 ("Dr. Kantor's deposition (Doc. 58-3) makes plain that his report (Doc. 58-1) is missing virtually any hallmarks of reliability.").) Each of those flaws, addressed below, revealed that Dr. Kantor's general causation opinions were not reliably supported "by good grounds for each step" in the analyses and thus reduced to inadmissible speculation. *See Kilpatrick*,

613 F.3d at 1341 (quoting *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005)). The District Court's decision to focus on Dr. Kantor's testimony and reports fell well within the wide range of acceptable options left to its discretion, and that decision is entitled to deference. *See Kumho Tire*, 526 U.S. at 142.

### B. Dr. Kantor failed to reliably establish epidemiological *associations* between exposures to PCE, TCE, and styrene and the development of MS.

Although Appellant relegates this issue to Section III of his brief, the most significant flaw in Dr. Kantor's general causation opinions concerns his reliance on epidemiological studies of exposure to "solvents" or "organic solvents"—as opposed to studies of the specific substances in question in this case.

For context, while the District Court considered the "full scientific record," it ultimately excluded Dr. Kantor's opinions on general causation. (App. Vol. 6, Doc 230 at 2, 4, 12.) General causation refers to the toxic-tort requirement of reliable proof that "the substance in question"—that is, the agent to which the plaintiff was allegedly exposed—"*can* cause the harm plaintiff alleges." *Chapman v. Procter & Gamble Distributing, LLC*, 766 F.3d 1296, 1303 (11th Cir. 2014).[2]

This Court has recognized certain "primary," "indispensable" methodologies

---

[2] *See also McClain*, 401 F.3d at 1239 ("General causation is concerned with whether an agent increases the incidence of disease in a group and not whether the agent caused any given individual's disease." (citing Michael D. Green et al., Reference Guide on Epidemiology, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 392 (Federal Judicial Center, 2d ed. 2000))).

for proving general causation, including through "epidemiological evidence." *See id.* at 1308. Dr. Kantor based his opinions primarily on epidemiology, so the District Court was required to "make certain" that his analyses reflect "the same level of intellectual rigor that characterizes the practice of an expert" epidemiologist. *See Kilpatrick*, 613 F.3d at 1335 (quoting *Kumho*, 526 U.S. at 152).

"Epidemiologists are ultimately interested in whether a causal relationship exists between an agent and a disease." REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 566 (Fed. Judicial Center, 3d. ed. 2011). "However, the first question an epidemiologist addresses is whether an *association* exists between exposure to the agent and disease." *Id.* (emphasis added).[3]

Dr. Kantor never reliably answered this "first question." *See id.* He restricted his opinions to three "agents": PCE, TCE, and styrene.[4] But he never identified an epidemiological study showing an association between MS and those agents or any mixture of those agents. (*See* App. Vol. 2, Doc. 58-3 at 114:5–16; *see also* Supp. App. Doc. 222 at 3–6 (providing study by study summaries of the scope of Dr. Kantor's cited studies); Supp. App. Doc. 136-1 (same in tabular format); Supp.

---

[3]  "An association between exposure to an agent and disease exists when they occur together more frequently than one would expect by chance." REFERENCE MANUAL at 566.

[4] Dr. Kantor initially opined on two additional substances: toluene and xylene. But by the specific causation stage, he "narrowed" his opinions to PCE, TCE, styrene, and mixtures of those agents. (Doc. 162-1 at 36:22–37:4.)

App. Doc. 221 (providing highlighted copies of all relevant studies).)

Instead, Dr. Kantor based his opinions on studies that either (a) considered "solvents" or "organic solvents" categorically or (b) considered groups of "solvents" that included agents to which Mrs. Davis did not claim exposure. (*See id.*) But while it is true that PCE, TCE, and styrene are organic solvents (in that they are carbon based and capable of dissolving other substances), it is also true that there are hundreds of other organic solvents with varying chemical structures. (*See* App. Vol. 2, Doc. 58-3 at 28:24–29:6 (Dr. Kantor agreeing that there are "lots" of industrial solvents other than PCE, TCE, and styrene).)

The wide array of chemically distinct organic solvents matters because "even small differences in chemical structure can sometimes make very large differences in the type of toxic response that is produced." *McClain*, 401 F.3d at 1246 (citation omitted); *see also Rider,* 295 F.3d at 1201 ("Even minor deviations in chemical structure can radically change a particular substance's properties and propensities."). Consequently, causation experts cannot simply "*presume*" that the agents to which a plaintiff was allegedly exposed exhibit the same disease-specific toxicities as a *different* set of agents—even if both sets of agents belong to the same chemical "class." *McClain*, 401 F.3d at 1246. Nor can an expert presume that all substances "in the same class" behave alike in terms of dose-response relationships. *See id.* "Such presumptions do not make for reliable opinions in toxic tort cases." *Id.*

Instead, if an expert opinion turns on a "chemical analogy," the proponent of the opinion must establish the analogy's reliability. *Id.* Otherwise, a break occurs in the inferential chain required to prove that the plaintiff's disease can be caused by the substances actually at issue in the case. Once that break occurs, the expert's opinion ceases being "scientific." *See Rider*, 295 F.3d at 1202 (cautioning courts "not to admit . . . inference that cannot be supported by sound scientific principles" or to allow "scientifically unsupported 'leaps of faith' in the causal chain"). "This is a fatal defect under *Daubert.*" *McClain*, 401 F.3d at 1244–45 (reversing admission of causation testimony from an expert who "did not show the reliability of each of his steps in deducing Metabolife's toxicity from [a chemical] analogy"); *see also Rider*, 295 F.3d at 1200–01 (affirming exclusion of expert testimony based on the unsubstantiated analogy "that because other ergot alkaloids cause vasoconstriction, then it is proper to conclude bromocriptine [an ergot alkaloid] must do so as well").

Here, Dr. Kantor's opinions depended on the chemical analogy that organic solvents, as a class, are alike enough in structure to presume that they are alike in their MS-specific toxicities (if any). Without this chemical analogy, there would be no basis for believing that epidemiological associations with other solvents, or with organic solvents as a class, would translate to associations with PCE, TCE, or styrene specifically.

Yet when questioned at his depositions about the grounds for this critical chemical analogy, Dr. Kantor admitted that it has no methodological basis. At his general-causation deposition, he conceded that solvents are not chemically interchangeable. (App. Vol. 2, Doc. 58-3 at 115:6–116:7.) Then at his specific-causation deposition, he admitted that molecular-structure and mechanistic comparisons that *he did not perform* would have been necessary to establish the MS-specific toxicities of different solvents:

> **Q.** Okay. Is it your testimony today that you believe all organic solvents behave similarly in terms of their MS-specific toxicity, if any? [**A.**] Yeah, I'm not saying that I think that all solvents necessarily act in the same way. I think many solvents probably do. [**Q.**] Okay. So how would you go about evaluating whether the dose-response relationship, if any, between PCE and multiple sclerosis is the same as the dose-response relationship between some other solvent and multiple sclerosis? [**A.**] So you would do several things. One is you would see if that other unnamed solvent did have epidemiological or other data to show—to suggest its causation or contribution to multiple sclerosis. You would look at the molecular structure of this unnamed solvent and see how similar. You would want to know the characteristics of when it's broken down in human beings, does that solvent act similarly or differently to—to the named solvents? [**Q.**] *Did you try to perform that sort of comparison in this case between any solvents*? **A.** *No*.

(Supp. App. Doc. 162-1 at 34:24–36:5 (emphasis added).) What's more, Dr. Kantor conceded that he is not an expert in chemistry or toxicology[5] (*id.* at 32:17–32:22) and is not even qualified to perform the comparisons necessary to substantiate his

---

5  Toxicology is the discipline "primarily concerned with identifying and under-standing the adverse effects of external chemical and physical agents on biological systems." REFERENCE MANUAL at 635.

chemical analogy (*see id.* at 32:23–33:3 ("**Q.** Do you believe that you're qualified to reliably assess whether and to what extent changes in the molecular structure of a substance result in changes to that substance's disease-specific toxicity? **A.** *No*." (emphasis added))).

So, far from making the sort of clear error of judgment necessary to reverse a *Daubert* decision, the District Court correctly recognized that Dr. Kantor's citations to studies of other solvents could not reliably support his opinions on PCE, TCE, and styrene. (*See* App. Vol. 6, Doc. 230 at 9–10 (citing Dr. Kantor's testimony to the effect that none of the studies he cited were restricted to the solvents at issue, and he could not exclude the possibility that study results were attributable to other substances (App. Vol. 2, Doc. 58-3 at 115:3–5, 116:8–119:11)).) Because there are "many, many types of solvents" (*id.* at 9 (citing Doc. 58-3 at 28:24–29:6)), the "science behind Dr. Kantor's conclusions is just not there" (*id.* at 10 (citing *Rider*, 295 F.3d at 1194)).

In this respect, Dr. Kantor's opinions were similar to those excluded in *Rider* and *McClain*—both cases involving an unsupported chemical analogy that rendered an expert's entire opinion unreliable. *See McClain*, 401 F.3d at 1244–45 ("The *Daubert* 'requirement that the expert testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis—means that *any* step that renders the analysis unreliable under the *Daubert factors renders the expert's*

*testimony inadmissible.*'" (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 267 (2d Cir. 2002))).

Dr. Kantor's opinions are also strikingly similar to those excluded in *Amorgianos*, the Second Circuit chemical-analogy opinion on which this Court relied in *McClain*. It too involved an analytical gap between a specific organic solvent (xylene) and organic solvents as a class. *See Amorgianos*, 303 F.3d at 270. After observing that the "use of organic solvents is ubiquitous in industry" and the "term 'organic solvent' identifies a general class of hundreds of chemical compounds that differ widely in structure and composition," the district court concluded that studies of exposure "to a variety of organic solvents" could not support an extrapolation to "xylene in particular." *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 137 F. Supp. 2d 147, 190 (E.D.N.Y. 2001). Largely for that reason, the district court excluded the plaintiff's general-causation experts, and the Second Circuit affirmed. *See Amorgianos*, 303 F.3d at 270.[6]

Dr. Kantor's opinions are also much like the excluded opinions addressed by the Fifth Circuit in *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347 (5th Cir. 2007). There as well, a general causation expert had opined that a specific solvent (benzene)

---

[6] Notably, while the district court in *Amorgianos* conducted "an extremely thorough review of the scientific literature on which plaintiffs' experts relied," the Second Circuit emphasized that "this degree of review, while commendable, may not always be necessary to evaluate whether proffered expert testimony is admissible." *Amorgianos*, 303 F.3d at 269.

could cause the plaintiffs' cancers, but he had based that opinion on studies that largely "failed to isolate benzene" as a cancer cause. *Id.* at 350. Those studies instead "focused on organic solvents as a class," addressed "a variety of organic solvents," or otherwise failed to "provide a reliable basis for the opinion that the types of chemicals appellants were exposed to could cause their particular injuries in the general population." *See id.* at 352–53. The district court therefore excluded the expert's general-causation opinions, and the Fifth Circuit affirmed. *See id.* at 355 ("Because the data relied on by [the expert] failed to provide a 'relevant' link with the facts at issue, his expert opinion was not based on 'good grounds.'"); *see also Guinn v. Astrazeneca Pharmaceuticals LP*, 602 F.3d 1245, 1249 n.1 (11th Cir. 2010) (citing *Knight* for its explanation of general causation).

In applying substantially similar reasoning to that of *Rider*, *McClain*, *Amorgianos*, and *Knight*, the District Court did not demand epidemiological certainty. (*See* Appellant's Br. at 25.) All it insisted upon was "the kind of empirically supported, rationally explained reasoning required in science." *Rider*, 295 F.3d at 1197; *see also Knight*, 482 F.3d at 354 ("We also understand that in epidemiology hardly any study is ever conclusive, and we do not suggest that an expert must back his or her opinion with published studies that unequivocally support his or her conclusions. . . . Nonetheless, the expert's testimony must be reliable at each and every step or else it is inadmissible."). That Dr. Kantor could

not provide this type of explanation confirms that the District Court appropriately discharged its gatekeeping duty in excluding his opinions. *See Kilpatrick*, 613 F.3d at 1341 n.18, 1343 (explaining that while a literature-based methodology need not "rely on articles that draw a direct, concrete, and absolute causal connection," "methodologies based on speculative literature . . . are not sufficient to pass *Daubert* review").

Nor did the District Court "establish[] an unreasonably rigid standard that could only be met with unethical human trials." (Appellant's Br. at 27.) For one thing, the Court did not "establish" any standard; it faithfully applied *Daubert* and Federal Rule of Evidence 702. For another, specific solvents are certainly capable of epidemiological review. Dr. Kantor himself cited solvent-specific epidemiology in the portion of his opinions addressing Parkinson's Disease (*see* Supp. App. Doc. 120-1 at 31, 33). But most importantly, epidemiology is only *one* means of reliably proving causation in a toxic-tort case. If there really were a cause-and-effect relationship between exposure to PCE, TCE, and styrene and the development of MS, then that relationship could also be proved through toxicological evidence of a dose-response relationship, through scientific knowledge of the "physiological processes involved" (as opposed to mechanistic theories of biological plausibility), or through other methodologies—provided that the methodologies met Rule 702's reliability requirements. *See Chapman*, 766 F.3d at 1306.

But here, no scientific methodology could support Dr. Kantor's general causation opinions because the truth is that the cause of MS remains unknown. As Dr. Kantor conceded, "the field's current understanding is that there is some sort of genetic background, and then there's some sort of environmental trigger, and that together they interact to have an individual exhibit the signs and symptoms of multiple sclerosis and be diagnosed with it." (Supp. App. Doc. 162-1 at 109:3–13; *see also* App. Vol. 2, Doc. 58-3 at 111:7–112:3 ("I agree that overall the cause of MS is unknown . . . .").) But what that "environmental trigger" is remains to be determined. Dr. Kantor repeatedly emphasized that solvents in general—let alone PCE, TCE, and styrene—might not really cause MS. (E.g., App. Vol. 2, Doc. 58-3 at 109:20–110:12.) The most he was willing to say was that he believed they probably do (*see id.*)—although he acknowledged that his use of terms such as "probably" or "more likely than not" were no more than expressions of his subjective strength of conviction (*see* Supp. App. Doc. 162-1 at 151:5–152:5, 187:21–189:10). "Subjective speculation that masquerades as scientific knowledge does not provide good grounds for the admissibility of expert opinions." *McClain*, 401 F.3d at 1245 (cleaned up).

Finally, Appellant fleetingly argues that another expert, Dr. Sahu, bridged any analytical gap between the "solvent" exposures addressed in Dr. Kantor's cited epidemiology and the PCE, TCE, and styrene exposures allegedly experienced by

Mrs. Davis.  (Appellant's Br. at 28; *see also id.* at 20–21.)  In a brief report, Dr. Sahu claimed to have "reviewed the exposure conditions in epidemiological studies of Multiple Sclerosis and *organic solvents* reviewed by Dr. Kantor," and he concluded that the "exposure conditions in these studies are qualitatively similar to the occupational exposures Mrs. Davis would have incurred in her employment at Lockheed Martin's SLRC."  (App. Vol. 4, Doc. 159-8 at 9 (emphasis added).)

But Dr. Sahu's opinion suffers from the same chemical-analogy flaw as Dr. Kantor's.  Dr. Sahu is an "environmental engineer" (Appellant's Br. at 20), not a toxicologist, epidemiologist, or other expert on "medical causation" (Supp. App. Doc. 167-1 at 50:2–13).  At his deposition, he expressly disavowed offering opinions grounded in any of those disciplines.  (*See id.*)  All he really did, in substance, was review Mrs. Davis's work history and conclude that she was "exposed to a range," or "mixed cocktail," of "industrial solvents."  (*See id.* at 194:11–195:10, 216:9–24.)  He then "qualitatively looked at some of [the] studies" cited by Dr. Kantor and concluded that "they, too, looked at various instances of occupational exposures to different types of solvents."  (*See id.* at 194:11–195:10.)

Aside from the fact that Dr. Sahu's "qualitative" analysis amounted to untestable, methodology-free speculation (*see* Supp. App. Doc. 183 (moving to exclude Dr. Sahu's testimony)), his opinion would not have shored Dr. Kantor's analytical gaps even if it had been reliable.  As his report and testimony make clear,

Dr. Sahu did not attempt the molecular-structure and mechanistic comparisons that Dr. Kantor himself testified would have been necessary to draw PCE-, TCE-, and styrene-specific conclusions from the cited epidemiological studies—nor did Dr. Sahu claim he was qualified to do so. (*See* Doc. App. Vol. 4, 159-8 (Dr. Sahu's report, containing no such analyses).) That is why Dr. Sahu expresses his qualitative conclusion in terms of "organic solvents" as a class. (*See id.* at 8.) Dr. Sahu's opinion thus involves the same unsubstantiated chemical analogy as Dr. Kantor's, making it equally inadmissible.

So in sum, the District Court was correct—and certainly abused no discretion—on the most important issue in this appeal: Dr. Kantor's "conclusion that these particular substances at issue cause MS is simply a wholly unproven hypothesis." (App. Vol. 6, Doc. 230 at 10.) As Lockheed Martin argued below, "Dr. Kantor's epidemiological analyses are unreliable for improper dependance on the assumption that all solvents are chemically analogous and for failure to identify an appropriate, substance-specific association in the epidemiological literature that could support a Bradford Hill analysis." (Supp. App. Doc. 60 at 25 (citations omitted); *see also* Doc. 222 at 2–3 (briefing the District Court on Dr. Kantor's inability to assess different solvents' disease-specific toxicities).)

**C.    Appellant failed to demonstrate that Dr. Kantor reliably weighed the epidemiological evidence and considered the Bradford Hill criteria, which are essential to parsing causation from association.**

Even if epidemiological associations with other organic solvents could reliably equate to associations with PCE, TCE, and styrene, the District Court still would have been correct to exclude Dr. Kantor's opinions because Appellant failed to demonstrate that those associations reflect cause-and-effect relationships.

"Once an association has been found between exposure to an agent and development of a disease, [epidemiological] researchers consider whether the association reflects a true cause effect relationship." REFERENCE MANUAL at 597. "In assessing causation, researchers first look for alternative explanations for the association, such as bias or confounding factors . . . ." *Id.* at 598. "Once this process is completed, researchers consider how guidelines for inferring causation from an association apply to the available evidence." *Id.* "These guidelines consist of several key inquiries that assist researchers in making a judgment about causation." *Id.*

Epidemiologists typically often apply these "guidelines" through "weight of the evidence" or "Bradford Hill" analyses. A "'weight of the evidence' analysis involves a series of logical steps used to infer to the best explanation." *In re Zoloft (Sertraline Hydrochloride) Products Liab. Litig.*, 858 F.3d 787, 795 (3d Cir. 2017) (cleaned up). "The Bradford Hill criteria are metrics that epidemiologists use to distinguish a causal connection from a mere association. These metrics include strength of the association, consistency, specificity, temporality, coherence,

biological gradient, plausibility, experimental evidence, and analogy." *Id.*; *see also* REFERENCE MANUAL at 599–606 (discussing the different Bradford Hill criteria).

As Lockheed Martin explained below, "weight of the evidence" and "Bradford Hill" are "flexible methodologies" that "can be implemented in multiple ways." *Id.* They thus pose a particularly acute risk of being inadmissible *ipse dixit* masquerading as sound science. (Supp. App. Doc. 60 at 15–16.)

Consistent with this Circuit's precedent that epidemiological analyses are admissible only if "the expert explains how the findings of those studies may be reliably connected to the facts of the particular case," *Hendrix*, 609 F.3d at 1196–97, thorough explanations of how an expert weighed evidence or applied the Bradford Hill criteria are essential. *See In re Zoloft*, 858 F.3d at 796 (reasoning that, to "ensure that the Bradford Hill/weight of the evidence criteria 'is truly a methodology, rather than a mere conclusion-oriented selection process . . . there must be a scientific method of weighting that is *used and explained*" (emphasis added)).

Dr. Kantor never provided this essential explanation. (*See* Supp. App. Doc. 60 at 16–22 (Lockheed Martin detailing Dr. Kantor's explanatory failures); App. Vol. 6., Doc. 230 at 5–7 (same by the District Court)). In short, Dr. Kantor *stated* in his initial expert report that he based his opinions "on the weight of the evidence," but he never *explained* his weighing methodology or demonstrated its

application. (*See* App. Vol. 1, Doc. 58-1 at 3, 29.) It was not until Lockheed Martin's expert witnesses criticized the opacity of Dr. Kantor's review (Supp. App. Docs. 72-1 at 160, 74-1 at 17) that he claimed, for the first time in his rebuttal report, to have applied "the Bradford Hill criteria" (App. Vol. 1, Doc. 58-2 at 4; App. Vol. 2, Doc. 58-3 at 37:3–9). But there too he only *stated* that he had applied the Hill criteria, never *explaining* or otherwise *demonstrating* how he viewed those criteria to apply to any MS study or set of studies. (*See generally* App. Vol. 1, Docs. 58-1, 58-2 (reports); *see also* App. Vol. 2, Doc. 58-3 at 37:10–38:2 (admitting that he "did not explicitly write about" how the Hill criteria applied to any MS studies).)

In like manner, Dr. Kantor agreed that when evaluating epidemiological associations, "it is important to consider each study's quality, design, relevance, and methodology; to assess plausible alternative explanations for any associations identified in a study; and to 'assess whether each study's limitations compromise its usefulness in drawing causal conclusions.'" (Supp. App. Doc. 60 at 19 (citing Doc. 58-3 at 71:18–23, 72:13–73:23).) Yet he did not discuss those considerations for any study in his expert report (App. Vol. 2, Doc. 58-3 at 74:3–6), nor did he disclose or explain the relative weights he purportedly assigned to different studies (*id.* at 76:21–24).

Dr. Kantor never even identified the full range of studies he considered. He concededly omitted from his report studies that did not support his conclusions

(*see id.* at 59:25–60:14), and he did not disclose a search methodology that could be used to identify the omitted studies (*id.* at 44:12–18, 46:17–20). And in the studies he did disclose, Dr. Kantor reported only the results he viewed as supporting his conclusions. (*See id.* at 63:19–65:3.)

So in sum, there was no place in the record where Dr. Kantor identified all of the studies he considered and explained the considerations he applied to them, both individually and collectively. (*Id.* at 76:13–16 ("**Q.** So there's no place in either of your reports where we can look to see your written assessment of all of the studies you cite, right? **A.** Correct."), 76:21–24 ("**Q.** Is there anywhere in your expert report or your rebuttal report where you explain the relative weights, if any, you assign to the different studies? **A.** No.").)

As the District Court correctly observed, this wholesale failure of explanation was itself sufficient to exclude Dr. Kantor's opinions. (*See* App. Vol. 6, Doc. 230 at 9.) To accept Dr. Kantor's representation that he reliably weighed the evidence and applied the Hill criteria would have amounted to "taking [Dr. Kantor's] word for it." *Hendrix*, 609 F.3d at 1201 (citation omitted). "The trial court's gatekeeping function requires more . . . ." *Id.*

Taking Dr. Kantor's reliability representations at face value is, however, precisely what Appellant now asks of this Court. Appellant's insistences that Dr. Kantor "***did***" conduct reliable weight-of-the-evidence and Bradford Hill

analyses are supported not by record citations *demonstrating* these methodologies, but rather by citations to the reports and deposition exchanges in which Dr. Kantor *stated* that he performed these methodologies but failed to show his work. (*See* Appellant's Br. at 33–36 (citing Doc. 58-1 at 3 (initial report)), App. Vol. 1, Doc. 58-2 at 3–4 (rebuttal report), App. Vol. 2, Doc. 58-3 at 8–10 (deposition).) An "expert's assurances that he has utilized generally accepted scientific methodology [are] insufficient." *McClain*, 401 F.3d at 1244.

Appellant also attempts to invert the burden of proof by arguing that the "district court's primary focus should be on analyzing the literature, not on the process of gathering and presenting the literature in the expert's report." (Appellant's Br. at 33 n.72.) But Federal Rule of Evidence 702 requires the proponent of expert testimony to "demonstrate" the testimony's reliability. That is not a new requirement. *See* Fed. R. Evid. 702 advisory committee's note to 2023 amendment (explaining that the rule was amended to "clarify and emphasize that expert testimony may not be admitted unless the proponent *demonstrates* to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule" (emphasis added) (citing Fed. R. Evid. 104(a))). In the context of epidemiological analyses, that demonstration requires explanation. (*See* App. Vol. 6, Doc. 230 at 6 (citing *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1311 (N.D. Fla. 2018) ("Importantly, because the

'weight of the evidence' approach involves substantial judgment on the part of the expert, it is crucial that the expert describe each step in the process by which he gathered and assessed the relevant scientific evidence.")).)[7]

Appellant's argument that experts should not be required to "detail 'Bradford Hill' criteria *in their report*" overextends the District Court's reasoning and trivializes the importance of expert reports. (*See* Appellant's Br. at 36.) The "range of choices" available to a district court when conducting a reliability assessment "is significant," and that remains true when evaluating Bradford Hill opinions. *See Kilpatrick*, 613 F.3d at 1343. Given that range—as well as the flexibility of the Hill criteria and the many forms toxic-tort cases can take—the level of detail required for a Hill-based opinion to satisfy Rule 702 might vary from case to case. The District Court never ruled otherwise. But what will *not* vary are Federal Rule of Evidence 702's requirement for demonstrating reliability and Federal Rule of Civil Procedure 26(a)(2)(B)(i)'s requirement that expert reports contain a "complete statement" of the "basis and reasons" for the expert's opinions.

---

[7] One possible reason for this lack of explanation was Dr. Kantor's belief that litigation requires less methodological clarity than the scientific community would require for peer review. (*See* App. Vol. 2, Doc. 58-3 at 40:23–41:11.) But again, the point of *Daubert* and Rule 702 is to ensure that experts bring the "same level of intellectual rigor" to both arenas, which has "greatly improved the quality of the evidence upon which juries base their verdicts." *Rider*, 295 F.3d at 1197 (citation omitted).

On this latter requirement, Dr. Kantor admitted that to the extent he considered the quality, design, methodologies, and results of the studies he cited (all of which bear on the Hill criteria), those considerations were bases of his opinions. (App. Vol. 2, Doc. 58-3 at 72:13–73:23.) And he also understood that his report "needed to include all of the bases and reasons for [his] opinions." (*Id.* at 30:6–9.) Yet he *still* chose not to explain how he applied those considerations. (*Id.* at 74:3–6.) Even after Lockheed Martin's experts criticized Dr. Kantor's lack of explanation for his opinions, he elected to submit a rebuttal report that continued to leave those explanations (if they existed) unstated. Having "'had ample opportunity to identify all of the bases for his conclusions and to explain his methodology in reaching those conclusions' and yet failing to do so," the District Court acted well within its discretion in finding that Dr. Kantor failed to demonstrate reliability. *See Williams*, 889 F.3d at 1246 (quoting *Kilpatrick*, 613 F.3d at 1341).

Finally, Appellant claims that the "district court's ruling raises the question of whether an expert's methodology is unreliable simply because he cites a single study with borderline statistical significance." (Appellant's Br. at 38.) This straw-man argument should be summarily rejected.

The District Court correctly faulted Dr. Kantor for his reliance on the statistically insignificant association expressed in the Riise 2002 study. (App. Vol. 6, Doc. 230 at 7–8 (quoting *Allison,* 184 F.3d at 1315 (holding that studies with

statistically insignificant results are "not worth serious consideration for proving causation")).)  The Court was right to do so, but it was also clear that this was only one of several "indicators of unreliability" in Dr. Kantor's report.  (*Id.* at 7.)  Other indicators included Dr. Kantor's reliance on studies that were "not even about MS." (*Id.* at 10 n.8 (citing Doc. 53-8 at 131:12–132:5 ("**Q.**  Turning back to Palin 2015, this is not a study of multiple sclerosis, right?  **A.**  Yes, I see the error here."));  *see also* App. Vol. 2, Doc. 58-3 at 128:5–129:22 (claiming he used Google Translate to read a study printed in Italian but failing to produce an English translation), 132:15–34:12, 176:20–78:14, 203:20 (conceding that his Bergamaschi 2016 citation was "not relevant to questions pertaining to organic solvents, claiming he believed the reference was a citation error, but proving unable to provide an alternative citation after having been given an opportunity to do so).)  This type of error "reinforce[d] the [District Court's] overall impression of [the] unreliability of his report."  (App. Vol. 6, Doc. 230 at 10 n.8.)

Given these and other indicia of unreliability—particularly when coupled with the unreliable chemical analogy addressed above—it "was within the District Court's discretion to conclude that the studies upon which [Dr. Kantor] relied were not sufficient, whether individually or in combination, to support [his] conclusions." *Allison*, 184 F.3d at 1314 (citation omitted); *see also Knight*, 482 F.3d at 355 ("Even if one of the studies relied on by [an expert] provided a plausible basis for general

causation, the district court, after weighing the "reliability" and "relevance" of such evidence, finding one or the other lacking, could still reach the conclusion that the evidence was inadmissible.").

### D. The District Court correctly analyzed and appropriately discounted Dr. Kantor's "secondary" causation evidence, including his cited publications from NIEHS.

The remainder of Appellant's arguments can be easily rejected. Because the District Court correctly concluded that Dr. Kantor's opinions were not epidemiologically sound, it rightly rejected Dr. Kantor's "secondary methodologies" too. (App. Vol. 6, Doc. 230 at 11 n.9.)

Appellant mainly contends that the District Court failed to consider Dr. Kantor's secondary evidence (mechanistic theories of biological plausibility and animal studies) "in the aggregate together with the epidemiology." (Appellant's Br. at 24.) But the District Court *did* consider all evidence in the aggregate. (App. Vol. 6, Doc. 230 at 11 n.10 (concluding that, "*in toto*, these secondary methodologies add little to Dr. Kantor's faulty weight of the evidence approach predicated on an unsound epidemiological review).) Appellant's argument to the contrary ignores the plain language of the District Court's order as well as its reasoned explanation of "the problems with [Dr. Kantor's] secondary methodology. (*See id.* (observing, among other flaws, that Dr. Kantor offered no explanation or

evidentiary support for how the results of the cited animal studies "can be extrapolated to prove similar effects in humans").)

If anything, the District Court went further than necessary in its analysis. The District Court would have been well within its rights to ignore Dr. Kantor's secondary evidence altogether, as it could never have overcome his unreliable analyses of the epidemiology—the only "primary" methodology Dr. Kantor attempted to utilize. *See Chapman*, 766 F.3d at 1308 (holding that because experts' "deposition admissions" confirmed that they "failed to demonstrate the primary methods" for proving causation, including epidemiologically, their secondary methodologies, including plausible explanations, generalized case reports, hypotheses, and animal studies [were] insufficient proof of general causation"). But instead of stopping with Dr. Kantor's primary methodological flaws, the District Court went on to break down flaws in Dr. Kantor's secondary evidence.

This notably included the NIEHS publications Appellant overemphasizes on appeal. To be clear, the cited NIEHS publications were "secondary literature" that "rely on scientific studies" performed by third parties. *See LeBlanc ex rel. Estate of LeBlanc v. Chevron USA, Inc.*, 396 F. App'x 94, 100 (5th Cir. 2010). They were thus no more valuable than the actual studies on which NIEHS relied. *See id.* And where underlying studies have been "properly rejected on their own," the secondary

literature "cannot meet the reliability requirement of *Daubert*." *See id.* (citing *Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 278 (5th Cir. 1998)).

Such was the case here. The panel behind the NIEHS publications found it "likely, but requiring confirmation," that "[s]olvents contribute to the development of MS." (App. Vol. 1, Doc. 58-1 at 29.) In support of that finding, they cited only two epidemiological studies: Riise 2002 and Landtblom 1996. (Supp. App. Doc. 58-5 at 7, 17 nn. 41, 42.) Notably, both of those studies were cited by Dr. Kantor and rejected by the District Court for failure to identify substance-specific associations. (*See* App. Vol. 6, Doc. 230 at 10 n.7 (noting that "some studies [Dr. Kantor] referenced did not even mention any of the substances in question" and citing Dr. Kantor's deposition testimony on Landtblom 1996 (App. Vol. 2, Doc. 58-3 at 146:8–147:23)); *id.* at 11 n.9 (referencing deposition testimony in which Dr. Kantor admitted that the results of Riise 2002 were statistically insignificant and that he could not rule out the possibility that the results were attributable to other substances (App. Vol. 2, Doc. 58-3 at 122:4–124:6)).)

Further, a full reading of the NIEHS panel's conclusion actually *supports* the District Court's decision to exclude Dr. Kantor's opinions. The panel stressed that when it stated that solvents "likely" cause or contribute to MS, the term "likely" had a precise meaning: "missing key evidence." (Supp. App. Doc. 58-4 at 14.) "Major research gaps," according to NIEHS, included "identification of specific causal

agents within general groups of exposures (e.g., . . . solvents).” (*Id.*)  In other words, NIEHS identified the exact same “gap” (that solvents are not chemically analogous) that precluded Dr. Kantor from reliably basing his general causation opinions on studies of “solvents” categorically.  (*See id.*)  That is why the NIEHS panel concluded its publication with a recommendation that “[a] focus on exposure assessment methodology is needed to improve the effectiveness of human studies.” (*See id.* at 2.)

Appellant makes no mention of this “[m]ajor research gap” despite it having been a focus of Lockheed Martin’s briefing and the District Court’s order. (*See* Supp. App. Doc. 60 at 24–25; App. Vol. 6, Doc. 230 at 11 n.10 (citing Doc. 58-3 at 108:1–6, 176:10–13).)  He instead attempts to sidestep the issue by arguing that the District Court mischaracterized NIEHS’s publications as risk assessments. (Appellant’s Br. at 31–32.)  But this argument misconstrues the District Court’s discussion.  What the Court actually did was scrutinize Dr. Kantor’s “reliance on public health agencies” because of their “role in recommending protective standards.”  (App. Vol. 6, Doc. 230 at 11 n.10.)  There were notably *two* “public health agencies” referenced in the portion of Dr. Kantor’s report cited by the District Court, one of which was the National Research Council (NRC).  (App. Vol. 1, Doc. 58-1 at 29–30.)  And the NRC paper *was* a risk-assessment recommendation. (*See id.* at 29–30, 57 (citing NRC 2009); *see also* Doc. 74-1 at 24 (Lockheed

Martin's expert toxicologist explaining that NRC 2009 suggested "possible changes in regulatory risk assessment procedures for USEPA"), 26–28 (further discussions of NRC 2009).)

And to the extent NIEHS was not making risk-assessment recommendations in the particular publications cited by Dr. Kantor, the District Court still did not "apply the wrong legal standard" to its analysis of those secondary documents. (Appellant's Br. at 12, 29–33 (citing *McClain*, 401 F.3d at 1249).) That argument misses the forest for the trees. The principal lesson from the *McClain* passage Appellant cites is that "the trial court should understand" what a statement from a regulatory health agency "really means about causation for the specific plaintiff." *See* 401 F.3d at 1249. The District Court did just that in recognizing that the NIEHS publications' lack of solvent-specific analyses prevented any reliable use as general causation evidence here.

One last point from Appellant's NIEHS argument warrants discussion. It is not true that the District Court held Appellant to too high a reliability standard simply because Florida's causations standard is "more likely than not." (Appellant's Br. at 31.) First, "[a]lthough the standards for finding causation are governed by Florida law, [courts in this Circuit] apply federal law to determine whether the expert testimony proffered to prove causation is sufficiently reliable to submit it to the jury." *Hendrix*, 609 F.3d at 1193. Second, even Florida's "'substantial factor' test

requires the plaintiff to show a causal link based on *reliable* evidence between a purported cause and the alleged injury." *Id.* at 1196 n.7 (emphasis added). So under either standard, reliability must be demonstrated, which requires more than the expert's *ipse dixit*. *Id.* at 1194. The NIEHS panel's characterization of its conclusion as "likely" no more establishes reliability than Dr. Kantor's own self-serving use of terms like "probable" or "more likely than not." No matter the speaker's subjective strength of conviction, the conclusion must be grounded in "scientific knowledge" or inferences "derived by the scientific method." *Id.* at 1197 (citation omitted). The District Court correctly concluded that neither the NIEHS publications nor Dr. Kantor's opinions met that standard.

### E. Because Dr. Kantor's general causation testimony was inadmissible, summary judgment was appropriate.

As explained, exclusion of Dr. Kantor's general causation testimony was the only appropriate choice in light of the critical flaws in his analyses. The District Court abused no discretion in making that choice, so summary judgment for Lockheed Martin was proper as well. *Kilpatrick*, 613 F.3d at 1333 n.1 ("[A]bsent the expert testimony . . . , summary judgment was proper.").

## II. ANY ERROR IN EXCLUDING DR. KANTOR'S GENERAL CAUSATION TESTIMONY WOULD HAVE BEEN HARMLESS BECAUSE HIS SPECIFIC CAUSATION OPINIONS WERE FACIALLY UNRELIABLE.

Alternatively, even if the District Court had abused its discretion in excluding Dr. Kantor's general causation opinions, that error would have been harmless because of the unreliability of Dr. Kantor's specific causation opinions.

"A showing that the district court erred or abused its discretion in excluding evidence does not lead automatically to a reversal." *United States v. Cameron*, 907 F.2d 1051, 1059 (11th Cir. 1990). "Such orders will not be disturbed except upon a showing of abuse of discretion, and then *only upon a showing that such abuse of discretion resulted in substantial harm* to the party seeking relief." *Id.* (cleaned up). Dispositive exclusions of expert testimony are thus reviewed for "harmless error," with the party asserting error bearing the burden of proving that the exclusion affected "substantial rights." *See id.* (citation omitted).

In toxic-tort cases, exclusion of an expert opinion on general causation can be harmless if the plaintiff lacked reliable evidence of specific causation. "Specific causation refers to the issue of whether the plaintiff has demonstrated that the substance actually caused injury in her particular case. Specific causation is often distinguished from general causation, which refers to the more general issue of whether a substance has the potential to cause the plaintiff's injury." *Guinn*, 602 F.3d at 1249 n.1 (citing *Knight*, 482 F.3d at 351).

The Fifth Circuit's *Knight* opinion is particularly instructive. As addressed in Section I(B) above, the expert's opinion in *Knight* shared several of the same core flaws as Dr. Kantor's, relying heavily on "organic solvent" studies that could not "isolate" the specific solvent at issue or that involved substantially different exposure conditions. *See* 482 F.3d at 350, 352–54. The district court thus excluded the expert's general causation opinions, and the Fifth Circuit found no abuse of discretion. *Id.* at 355.

But the Fifth Circuit also found that any abuse of discretion would have been harmless due to the expert's inability to support a reliable specific causation opinion. "Although the district court [had] limited its analysis to general causation, the studies it excluded [were] neither reliable nor relevant for specific causation." *Id.* Said another way, because the appellants had relied on the same expert "to provide testimony as to both general causation and specific causation," *id.* at 351–52, the expert was required to establish reliable bases for both types of testimony, *id.* at 355. But even the expert's studies that "could arguably support" general causation "would not support the conclusion" that the solvent at issue caused the appellants' "particular illnesses" (that is, they would not support specific causation). *Id.* "[A]ny error as to general causation [was thus] harmless." *Id.*

So too here. At the specific causation stage, Dr. Kantor relied on substantially the same scientific literature he cited at the general causation stage. (*See* App.

Vol. 4, Doc. 157-7 at 3.)[8]  But as Dr. Kantor admitted, none of the studies that investigated solvent exposures and MS quantified or estimated the studies subjects' exposure conditions.  (Supp. App. Doc. 162-1 at 52:4–8.)  Consequently, for the reasons explained in Lockheed Martin's motion to exclude Dr. Kantor's specific causation testimony (Supp. App. Doc. 170)—which the District Court considered but did not expressly address in its final order (*see* App. Vol. 6, Doc. 230 at 1–2)— Dr. Kantor never attempted the dose-response assessments that are essential to reliable specific causation opinions, nor would he have been able to do so on this record.

In short, "[d]ose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect." *Pinares v. Raytheon Techs. Corp.*, No. 19-14831, 2023 WL 2661521, at *3 (11th Cir. Mar. 28, 2023) (quoting *McClain*, 401 F.3d at 1242).  "[T]o establish specific causation, [an expert must] reliably calculate whether [the plaintiff] was 'exposed to enough of the toxin to cause the alleged injury,' which [can be] done only after reliably calculating *how much* exposure would have adversely affected her." *Williams*, 889 F.3d at 1246 n.2 (quoting *McClain*, 401 F.3d at 1239).  Further, it is not enough to establish exposure

---

[8]   The only new literature on MS was Nourbaksh 2019, which Dr. Kantor cited because of its compilation of MS risk factors (App. Vol. 4, Doc. 157-7 at 2) but which tellingly did not include *any* solvent exposures in its risk-factor lists (Supp. App. Doc. 157-17 at 5).

levels that pose some unknown, theoretical risk of causing the plaintiff's disease. Rather, specific causation experts must "demonstrate a scientific basis for concluding that [the plaintiff's] exposure levels would *likely* produce, contribute to, or exacerbate [her] conditions." *Id.* at 1246 (emphasis added) (reiterating that the expert must place the plaintiff "within the class of persons who would *likely* suffer from exposures at the ranges he estimated" (emphasis added)). To meet this standard, the expert must lay a "reliable groundwork for determining the dose-response relationship" (if any) between the substances in question and the plaintiff's disease. *Id.* at 1248 (citation omitted).[9]

---

[9] As the District Court noted in its final order, it had previously rejected Lockheed Martin's argument that Appellant failed to establish the helpfulness or "fit" of Dr. Kantor's general causation opinions because the opinions did not account for case-relevant exposure conditions (i.e., comparable doses). (Doc. 230 at 4 n.2.) To summarize that argument, establishing comparable concentrations and durations of exposure is an essential part of "explain[ing] how the findings of [epidemiological] studies may be reliably connected to the facts of the particular case," *Hendrix*, 609 F.3d at 1196–97. Making that connection enables deductive reasoning necessary to reliably answer the general causation question, which is whether the *plaintiff's* alleged exposure could have caused her disease, not whether her disease could have been caused by exposures of different concentrations or durations.

But while Lockheed Martin respectfully disagrees with that interim ruling and believes its reasoning is not in accord with the scientific and legal purposes behind the general causation standard (*see* Doc. 170 at 3–13 (briefing the component requirements of proving probable causation in a toxic tort case)), the Court's correct conclusion that Appellant failed to reliably establish exposures to comparable substances obviated the need to address comparable doses. And in any event, "[s]etting general causation aside, to establish specific causation, [experts] would still have to reliably calculate" both the "*how much*" exposure is necessary to cause

But here, Dr. Kantor never laid that groundwork. At the general causation stage, Dr. Kantor testified that he did not "consider potential exposure levels *at all* in forming [his] opinions" (App. Vol. 2, Doc. 58-3 at 49:12–21), and he was "not convinced that anybody knows" whether changes in the intensity or duration of exposure to solvents would change the incidence of MS (*see id.* at 54:18–23).

Dr. Kantor's dose-response analyses did not improve at the specific causation stage. "Stripped to its bare essentials, a dose–response assessment *estimates scientifically* the dose or level of exposure at which [a substance] causes harm." *Williams*, 889 F.3d at 1246 (cleaned up) (emphasis added). But at his deposition, Dr. Kantor admitted he could provide no such estimate for any substance at issue:

> **Q.** Do you have a ***scientific estimate*** of the ***dose*** of PCE a person would have to inhale ***to cause or substantially contribute to MS***? **A. *No*.** **Q.** The same question for TCE. **A. *No*. Q.** The same question for styrene. **A. *No*. Q.** The same question for any mixture of PCE, TCE, and styrene. **A. *No*.**

(Supp. App. Doc. 162-1 at 44:11–24 (emphasis added).) Likewise, "causation experts, and the articles upon which they [rely], [must] determine '*how much*' of the substance needed to 'be [inhaled] for *how long*' to cause harm." *See Pinares*, 2023 WL 2661521, at *3 (emphasis added) (quoting *Chapman*, 766 F.3d at 1307). Again, Dr. Kantor could not make this determination:

---

the plaintiff's disease and that the plaintiff was exposed to that amount. *Williams*, 889 F.3d at 1246 n.2. Dr. Kantor failed in both respects.

> **Q.** Okay. Is it fair to say, then, that ***you do not have an estimate*** of ***how much*** PCE a person would have to inhale for ***how long*** to materially increase a person's chance of developing MS? **A.** ***Correct***. **Q.** The same question for TCE. **[A.]** Right. **Q.** The same question for styrene. **[A.]** Correct. **Q.** The same question for any mixture of PCE, TCE, and styrene. **A.** Correct.

(Supp. App. Doc. 162-1 at 44:25–45:18 (emphasis added).) Dr. Kantor simply never laid a groundwork at any stage of this case for assessing dose-response relationships.

And even if he had been able to lay that groundwork, Dr. Kantor had no estimates—reliable or otherwise—of doses to which Mrs. Davis was allegedly exposed. He relied exclusively on Dr. Sahu to establish Mrs. Davis's exposures. (Supp. App. Doc. 162-1 at 22:12–20; *see also* App. Vol. 4, Docs. 157-7, 157-8 (Dr. Kantor's specific-causation reports).) But as addressed above (see Section I(B)), Dr. Sahu performed only a "qualitative" exposure analysis based on the epidemiological studies Dr. Kantor cited in his general causation reports. Typically assessing exposure only through questionnaires, none of the studies could specify the solvents to which the study subjects were exposed, nor could they estimate exposure concentrations. (*See* Supp. App. Doc. 162-1 at 52:4–8.) So nothing in the studies provided a basis from which Dr. Sahu could "demonstrate" Mrs. Davis's "actual level of exposure," *see McClain*, 401 F.3d at 1241, and he made no attempt to do so.

The lack of exposure information in the epidemiological studies underlying his opinions also left Dr. Kantor without any basis for assessing dose-specific risk.

Her was never able to identify any study of any kind that expressed an incidence of MS that corresponded to a concentration of PCE, TCE, or styrene (Supp. App. Doc. 162-1 at 229:18–230:4), which means that even if Dr. Sahu had given Dr. Kantor a rough estimate of relevant doses, Dr. Kantor would have been unable to assess whether or to what extent those doses correspond to an increased incidence of MS. "*Daubert* decisions" in this and "other courts warn against leaping from an accepted scientific premise to an unsupported one." *Allison*, 184 F.3d at 1314 (citing *Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 278–79 (5th Cir. 1998), which this Court characterized as "finding that physician could not show reactive airways dysfunction syndrome ('RADS') was caused in a patient when his exposure level to toluene was unknown").

All of this leads to the core dose-response flaw in Dr. Kantor's opinions: they ultimately reduce to a one-hit, "single-molecule," no-safe-dose theory of causation. This Court has repeatedly rejected such opinions as unreliable. *See Pinares*, 2023 WL 2661521, at *4 (affirming exclusion of a "one-hit" specific-causation opinion); *see also McClain,* 401 F.3d at 1241 (finding unreliable testimony from an expert who insisted that "any level" of exposure to the substance at issue was "too much").

Here, Dr. Kantor "assum[ed]" for purposes of his expert opinions that PCE, TCE, and styrene exhibit linear no-threshold (LNT) dose-response relationships with MS, essentially meaning that every exposure poses some non-zero MS risk.

(*See* App. Vol. 1, Doc. 58-1 at 27); *see also* REFERENCE MANUAL at 642 (explaining the development of the LNT model and resulting "one-hit theory of cancer risk"). But he also testified that even if his LNT assumption were correct, the risk of developing MS would vary with the dose, and he could not describe when doses would start to pose appreciable risks:

> **Q.** . . . So is it your opinion in this case that doses of PCE as low as a single molecule are capable of causing MS? **A.** I think it's possible though that they can cause or contribute to multiple sclerosis. **Q.** No. I'm asking if you believe that they more likely than not do, to a reasonable degree of the scientific certainty? **A.** So that one time, one molecule a person gets exposed to? Is that what your question is? **Q.** Yes. **A.** I think it's unlikely. ***But your next question would be, Well, then what is that level? And that's where it's hard to answer the question.*** **Q.** ***Are you able to answer that question?*** **A.** ***No.*** **Q.** Is that true for PCE, styrene, and any mixture of TCE, PCE, and styrene as well? **A.** Yes.

(Supp. App. Doc. 162-1 at 79:21–81:8.) Dr. Kantor thus never identified a dose at which corresponding MS risks would be even appreciable, let alone "likely [to] produce, contribute to, or exacerbate" MS. *See Williams*, 889 F.3d at 1246.

Dr. Kantor's specific causation opinions suffered from several other fatal flaws. He "very clearly stated that people get multiple sclerosis for many other reasons besides the exposures . . . that are alleged to have occurred" (Supp. App. Doc. 162-1 at 134:12–18), and he was unable to exclude the possibility that Mrs. Davis's MS developed exclusively due to genetic susceptibility and other risk factors, such as exposure to the Epstein-Barr virus (*id.* at 140:4–140:23). He likewise did not attempt "to quantify the relative contribution of any of [Ms. Davis's]

risk factors." (*Id.* at 152:21–153:3); *see also Guinn*, 602 F.3d at 1256 (affirming exclusion of an expert who "made no attempt to quantify the relative contribution of [the plaintiff's] risk factors").

But Dr. Kantor's dose-response failures—driven by the limitations of the same studies that rendered his general causation analysis unreliable—are the most clear evidence that his specific causation opinions are also unreliable. After all, if Dr. Kantor himself could not discern doses that pose even an appreciable risk of harm, how could a jury rationally find that the doses to which Mrs. Davis was allegedly exposed were the *probable* cause of her MS?

The answer, of course, is that it could not. Any verdict otherwise would amount to rank speculation. For that reason, Dr. Kantor's specific causation opinions are necessarily unreliable under *Daubert* and insufficient to withstand summary judgment under Florida's probable causation standard. *See Guinn*, 602 F.3d at 1256–57 (concluding that testimony amounting to "mere speculation" failed to satisfy both standards).

This brings us back to harmless error. Cases could exist in which the procedural posture would prevent this Court from assessing whether an erroneous exclusion of general causation testimony was harmless due to unreliable specific causation evidence. Bifurcated proceedings could mean, for example, that specific causation opinions were not developed by the time general causation opinions were

excluded. There might also be cases where specific causation testimony strikes this Court as unreliable, but not so much so that its admission would necessarily be error; on some records, exclusion and admission could both fall within the Court's wide discretion such that remand to the District Court would be warranted.

Here though, Dr. Kantor's dose-response analyses fall so far short of this Court's baseline reliability requirements that admission of his testimony would have been error. "In toxic tort cases, scientific knowledge of the harmful level of exposure to a chemical plus knowledge that plaintiff was exposed to such quantities are minimal facts necessary to sustain the plaintiff's burden." *McClain*, 401 F.3d at 1241 (cleaned up); *see also id.* at 1239 (holding that "even had the trial court fully accepted its [gatekeeping] role, it would have abused its discretion by admitting" expert testimony that failed to reliably address the dose-response relationship). Dr. Kantor was unable to reliably address either of these "minimal facts," making his testimony inadmissible and insufficient to create a genuine issue of material fact on specific causation.

Lockheed Martin would therefore have been entitled to summary judgment even if the Court's exclusion of Dr. Kantor's testimony had been an abuse of discretion—which, for the reasons expressed above, it was not. Any general-causation errors would thus have been harmless, requiring affirmance of the judgment below. *See Knight*, 482 F.3d at 355.

## CONCLUSION

For the reasons expressed above, Lockheed Martin respectfully requests that this Court affirm the District Court in all respects.

Respectfully submitted,

By: */s/ David B. Weinstein*

Brigid F. Cech Samole
GREENBERG TRAURIG, P.A.
333 S.E. Second Avenue, Suite 4400
Miami, Florida 33131
Telephone: 305.579.0500
cechsamoleb@gtlaw.com
miamiappellateservice@gtlaw.com

David B. Weinstein
Ryan Hopper
Irina Khasin
Christopher R. White
Jennifer M. Faggion
GREENBERG TRAURIG, P.A.
101 East Kennedy Boulevard
Suite 1900
Tampa, Florida 33602
Telephone: 813.318.5700
weinsteind@gtlaw.com
hopperr@gtlaw.com
irina.khasin@gtlaw.com
whitech@gtlaw.com
jennifer.faggion@gtlaw.com

*Counsel for Defendant-Appellee, Lockheed Martin Corporation*

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the length limit of Fed. R. App. P. Rule 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 12,169 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Word 2010 in Times New Roman, 14-point font.

*/s/ David Weinstein*
David B. Weinstein

## CERTIFICATE OF SERVICE

I certify that on May 22, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF and that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ David Weinstein*
David B. Weinstein