## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

Michael Davis,

*Plaintiff-Appellant*,

v.

Lockheed Martin Corporation,

*Defendant-Appellee*

Appeal from the United States District Court
for the Middle District of Florida

No. 6:22-cv-81-RBD-DCI

## APPELLANT'S REPLY BRIEF

Josh Autry
Morgan & Morgan
333 W Vine St, Ste 1200
Lexington, KY 40507
859-899-8785
jautry@forthepeople.com

Rene F. Rocha
Morgan & Morgan
400 Poydras St, Ste 1515
New Orleans, LA 70130
954-318-0268
rrocha@forthepeople.com

Adam P. Bergeron
Morgan & Morgan
47 Maple St, Ste 104D
Burlington, VT 05401
407-974-2075
adambergeron@forthepeople.com

*Attorneys for Appellant Michael Davis*

**Michael Davis v. Lockheed Martin Corporation**

**CERTIFICATE OF INTERESTED PERSONS**

Albanis, Panagiotis V.

Appel, Marie N.

Askren, Jillian M.

Autry, Josh

Bergeron, Adam P.

Citera, Francis A.

Dalton Jr., Roy B., U.S. District Judge

Davis, Michael

De Milt, Donna

Estate of Carol Davis

Goldrosen, Eitan

Hopper, Ryan T.

Irick, Daniel C., U.S. Magistrate Judge

Jackson, Raymond D.

Jarecki, Shawn K.

Juda, Laura

Juda, Mark

Kantor, Daniel

Kantor Neurology

Kendall, Ronald J.

Khasin, Irina

Kozak, Jeff

Lockheed Martin Corporation LMT

McGarry, Ann

McGarry, Michael

Miller, Gretchen N.

Moore, Joshua D.

Morgan & Morgan, P.A.

Morgan, T. Michael

Petosa, Frank M.

Porter, Bryan C.

Ram, Michael F.

Rocha, Rene F.

Rutledge, Eric

San Martin, Emilio

Slusarz, Brian

Torres, Christopher

University City Property Management III, LLC

Weinstein, David B.

White, Christopher

Winn, Jennifer N.

# TABLE OF CONTENTS

Certificate of Interested Persons ...........................................................C-1

Table of Contents ............................................................................... i

Table of Citations ............................................................................... ii

Introduction ........................................................................................1

Argument.............................................................................................1

  I. The district court did not analyze the epidemiological literature offered by Dr. Kantor to support his opinion. ...........................................................1

    A. *Daubert* requires a district court to analyze scientific literature offered in support of a general causation opinion.......................................2

    B. There is no basis for a presumption that the district court reviewed the scientific record. ........................................................................5

  II. Dr. Kantor relied on epidemiological studies of the solvents to which Mrs. Davis was exposed...........................................................................7

  III. Dr. Kantor reliably weighed the evidence and he is not required to document the weighing process in his report. ...................................................12

  IV. The district court was not entitled to "ignore" secondary evidence. ..............16

  V. A dose-response assessment is not required when an expert has established general causation with epidemiological evidence. .........................................19

Conclusion .........................................................................................25

Certificate of Compliance ......................................................................26

<h1 style="text-align: center;">TABLE OF CITATIONS</h1>

## Cases

*Allison v. McGhan Medical,* 184 F.3d 1300 (11th Cir. 1999) .................... 3, 4, 6, 13

*Amorgianos v. Natl. R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) ........ 10, 11

*Chapman v. Procter & Gamble Distributing, LLC,* 766 F.3d 1296 (11th Cir. 2014) ...................................................................................................... 16, 20, 22

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) ...1, 2, 5, 7, 11, 13, 19, 22

*Gulfpoint Constr. Co., Inc. v. Westfield Ins. Co.*, 2024 WL 1759288, at *7 (11th Cir. Apr. 24, 2024) ................................................................................................. 19

*Hemmings v. Tidyman's Inc.*, 285 F.3d 1174 (9th Cir. 2002) ................................. 19

*Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183 (11th Cir. 2010) ........... 2, 22

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) ............................... 17

*In re Zoloft (Sertraline Hydrochloride) Products Liab. Litig.*, 26 F. Supp. 3d 449 (E.D. Pa. 2014) ................................................................................................. 12

*Kilpatrick v. Breg, Inc.,* 613 F.3d 1329 (11th Cir. 2010) ....................... 3, 4, 6, 7, 13

*Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347 (5th Cir. 2007) ........................ 11

*Littell v. U.S.*, 2004 WL 5633783 (M.D. Fla. Mar. 19, 2004) ................................ 14

*McClain v. Metabolife Intern., Inc.,* 401 F.3d 1233 (11th Cir. 2005) .....9, 10, 11, 19, 21, 22, 24

*Pinares v. Raytheon Techs. Corp.*, 2023 WL 2661521 (11th Cir. Mar. 28, 2023) . 19, 20, 21

*Quiet Technology DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333 (11th Cir. 2003) .............................................................................................................. 19

*Rappuhn v Primal Vantage Company*, No. 23-10050 (11th Cir. June 11, 2024) ...5, 7

*Rider v. Sandoz Pharmaceuticals Corp.,* 295 F.3d 1194 (11th Cir. 2002). 3, 6, 9, 10, 11, 13, 20, 22

*Seamon v. Remington Arms Co., LLC*, 813 F.3d 983 (11th Cir. 2016) ................... 18

*United Fire and Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338 (11th Cir. 2013) ........ 7

*United States v. Alabama Power Co.*, 730 F.3d 1278 (11th Cir.2013) ................... 18

*United States v. Barton*, 909 F.3d 1323 (11th Cir. 2018) ........................................ 5

*Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir. 1999) .......................... 24

*Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239 (11th Cir. 2018).... 19, 20, 21, 24

## Rules

Fed. R. Civ. P. 26(a)(2) ........................................................................................... 16

Fed. R. Civ. P. 37(c)(1) ........................................................................................... 16

## INTRODUCTION

With the close of briefing in this appeal, it should be apparent that the district court did not fulfill its duties under *Daubert* when it excluded Dr. Kantor without meaningfully evaluating the evidence supporting his opinion. The precedent from this Court shows both that (1) a district court must analyze the literature when a causation opinion is grounded in literature; and (2) failure to analyze the evidence underlying an expert opinion is an abuse of discretion.

In Argument Section II of its brief, Defendant makes an additional argument pertaining to specific causation and dose-response evidence that is beyond the scope of the decision on appeal. Nonetheless, Plaintiff responds to those arguments in Section V of this reply brief to show that Defendant misinterprets the case law as requiring dose-response assessments in all toxic tort cases when, in fact, such an assessment is required only if the expert elects to proceed with a dose-response methodology at the general causation phase. Where, as here, Dr. Kantor established general causation with epidemiology, a dose-response assessment is not required at the specific causation phase.

## ARGUMENT

## I.     The district court did not analyze the epidemiological literature offered by Dr. Kantor to support his opinion.

In Argument Section I(A) of its brief, Defendant concedes that the parties submitted to the district court "not only the studies at issue in this appeal, but also

summary tables of the studies' strengths and weaknesses,"[1] yet Defendant cannot explain why the district court failed to address any of the studies in its decision. Instead, Defendant makes two arguments in an attempt to mitigate this failure by the district court. First, Defendant argues that a district court is not required to analyze the scientific literature underlying a causation opinion. Second, Defendant argues for a "presumption" that the district court reviewed the scientific record despite no indication in the decision that the district court actually did so.[2] These arguments are addressed in turn.

### A. *Daubert* requires a district court to analyze scientific literature offered in support of a general causation opinion.

Where, as here, an expert relies on "medical literature to establish general causation," then the question the district court must answer is whether the literature "provide[s] enough support for [the] general causation opinion to satisfy *Daubert*'s reliability requirement." *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1199 fn. 11 (11th Cir. 2010). So, it should go without saying that a district court's gatekeeping duty under *Daubert* requires it to analyze the literature when the expert bases an opinion on such literature. That was the approach taken by this Court and

---

[1] Appellee Br. at 12.
[2] Appellee Br. at 13.

the district courts in *Hendrix*, *Rider*, *Allison*, and *Kilpatrick*. Each of those decisions entailed thorough analyses of the literature as explained in Plaintiff's opening brief.[3]

Defendant disagrees, arguing that an analysis of the literature is only "*one* way to analyze the reliability of an expert opinion grounded in scientific literature."[4] However, Defendant offers little guidance on how a district court could determine whether an opinion is sufficiently supported by literature without reference to the literature itself, and Defendant largely ignores the literature analyses in *Hendrix*, *Rider*, *Allison*, and *Kilpatrick*. Defendant only quotes a single sentence out of context from *Kilpatrick* to suggest that a court can make a reliability determination with reference to deposition testimony instead of the literature.[5] But this selective quoting ignores the heavy emphasis the *Kilpatrick* Court placed on analyzing the literature in the remainder of the opinion.

For example, the *Kilpatrick* Court explained that the causation expert "formed his opinions after reviewing medical literature" and then wrote that "it was entirely proper—***indeed necessar****y*—for the district court to focus on the reliability of these sources [i.e., the literature]…" *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1336 (11th Cir. 2010) (emphasis added); *see also id*. ("The district court focused exclusively on

---

[3] *See* Appellant Br. at 13-15 (Doc. 18 p. 22-24) (discussing *Hendrix*, *Rider*, *Allison*, and *Kilpatrick*).

[4] Appellee Br. at 10 (Doc. 29 p. 19) (emphasis by Defendant).

[5] Appellee Br. at 11 (Doc. 29 p. 20) (citing *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1340 (11th Cir. 2010)).

***the materials*** and methods Dr. Poehling used to form his opinions… This is exactly what the district court was supposed to do.") (emphasis added).

The *Kilpatrick* Court then dedicated multiple pages of its opinion to analyzing whether the literature supported the causation opinion. *Id*. at 1337-40 (analyzing the Hansen study, the Gomoll study, the Greis report, and the Lubowitz editorial). The Court also cited with approval "the district court's lengthy and detailed decision" in which the district court engaged in a thorough analysis of the literature offered by the expert. *Id*. at 1336 (citing *Kilpatrick v. Breg, Inc.*, 2009 WL 2058384 (S.D. Fla. June 25, 2009)). Accordingly, despite what Defendant argues, *Kilpatrick* cannot be construed as allowing exclusion of an expert without a review of the literature relied upon by the expert.

Additionally, Defendant proposes, without citing authority, that "there are cases in which" analyzing the literature "is unworkable and unnecessary."[6] Defendant then discusses the "sheer volume of materials before the District Court" as if that could alter the court's *Daubert* gatekeeping duties.[7] While Plaintiff is sympathetic to the challenges of adjudicating a complex case, the complexity of a case does not provide a basis to dismiss a case on *Daubert* grounds without a proper *Daubert* analysis. *See, e.g., Allison*, 184 F.3d at 1311 (describing the "painstaking

_____

[6] Appellee Br. at 10 (Doc. 29 p. 19).
[7] Appellee Br. at 10, fn. 1 (Doc. 29 p. 19).

analyses which district courts undertake in making these admissibility determinations" under *Daubert*); *Rappuhn v Primal Vantage Company*, No. 23-10050 (11th Cir. June 11, 2024), at 2 ("As we have explained, '[t]o faithfully discharge its gatekeeping duty,' the district court 'must engage in a rigorous' analysis.") (quoting *United States v. Barton*, 909 F.3d 1323, 1331 (11th Cir. 2018)).[8] Indeed, such a standard would only serve to punish litigants with a significant amount of scientific evidence substantiating their cases. If anything, the volume of expert materials in this case makes it even more remarkable that the district court disposed of it with almost no analysis of the key evidence supporting Dr. Kantor's opinions.

### B. There is no basis for a presumption that the district court reviewed the scientific record.

Alternatively, Defendant urges this Court to simply presume that the district court analyzed the studies even though the court's decision gives no indication that it did.[9] As support for such a presumption, Defendant points to the decision at page 11, footnote 9, where the court cited Dr. Kantor's deposition testimony and, as

---

[8] Available at https://media.ca11.uscourts.gov/opinions/unpub/files/202310050.pdf
[9] *See* Appellee Br. at 13 (Doc. 29 p. 22) (seeking a "presumption" based on "good reason to believe that the District Court read and analyzed the key studies in the record").

Defendant reasons, the district court must have reviewed the studies in conjunction with citing the testimony because the studies were discussed at the deposition.[10]

However, to the contrary, footnote 9 actually shows the district court's unfamiliarity with the studies because the court stated that Dr. Kantor relied on "studies" (plural) "that found statistically insignificant associations"—which is an inaccurate statement. In fact, the parties agree in their briefs that only one study, Riise 2002, showed statistical insignificance (Defendant does not dispute the statistical significance of Landtblom 1996, Barragan-Martinez 2012, Hedstrom 2018, Bostrom 2019, or Gerhardsson 2021).[11] By misstating the statistical significance of the epidemiology as a whole via a single sentence in a footnote, it seems evident that the district court did not actually review the studies.

Nor do *Kilpatrick*, *Rider*, *Allison*, or *Hendrix* provide support for the presumption that Defendant seeks because, in contrast to those cases, here the district court entirely omitted any discussion of the studies.[12] For example, Defendant cites *Kilpatrick* where the appellant claimed the district court had overlooked the Chu study.[13] In response, the Court acknowledged the possibility that the study had been

---

[10] Appellant Br. at 11 (Doc. 29 p. 20) (citing Doc. 230 p. 11 n.9).

[11] *See* Appellant Br. at 16-19 (Doc. 18 p. 25-29) (summarizing study results and acknowledging Riise is statistically insignificant); Appellee Br. at 32 (only claiming Riise is statistically insignificant).

[12] *See* Appellant Br. at 13-15 (Doc. 18 p. 22-24) (discussing *Hendrix*, *Rider*, *Allison*, *Kilpatrick* and *Joiner*).

[13] Appellee Br. at 12 (Doc. 29 p. 21) (citing *Kilpatrick*, 613 F.3d at 1341 n.17).

overlooked but explained "even if the district court had considered the Chu study together with ***the other four pieces of literature it examined***, it is clear that the court would not have altered its conclusion." *Kilpatrick*, 613 F.3d at 1341 (emphasis added). So, at most, *Kilpatrick* stands for the proposition that a district court overlooking ***one*** study in the record might be harmless if the court otherwise fully examines the scientific record ***and*** if the overlooked study would not change the court's conclusion. *Kilpatrick* does not stand for the proposition that a district court may overlook ***all*** of the studies in the record. By doing so in this case, the district court abused its discretion. *See United Fire and Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341-42 (11th Cir. 2013) (holding that a "sweeping exclusion" of an expert opinion is an abuse of discretion when the district court failed to consider evidence in the record supporting the opinion); *Rappuhn*, at 2 (finding an abuse of discretion where "[t]he district court didn't perform a proper expert analysis under *Daubert*").

II.     **Dr. Kantor relied on epidemiological studies of the solvents to which Mrs. Davis was exposed.**

In Argument Section I(B) of its brief, Defendant offers the same inadequate *Daubert* analysis as the district court did by omitting any analysis of the studies while also asserting that the studies do not support Dr. Kantor's opinion. Instead of looking to the studies themselves, Defendant and the district court cited a snippet of deposition testimony where Dr. Kantor acknowledged that the epidemiological

studies tested other solvents in addition to the solvents at issue in this case.[14] However, as demonstrated in Plaintiff's opening brief, the solvents at issue *were* studied in the epidemiology cited by Dr. Kantor although neither the district court nor Defendant acknowledged this fact.[15]

Moreover, as Defendant notes, the district court did not even focus on the correct solvents in the decision on appeal. Initially, at the general causation phase, Dr. Kantor offered opinions on TCE, PCE, styrene, toluene and xylenes, but at the specific causation phase, he opined that exposures to TCE, PCE, and styrene caused Mrs. Davis's multiple sclerosis, which was made clear in the specific-causation briefing.[16] In the decision on appeal, the court said it was "tak[ing] general and specific causation up on the full scientific record,"[17] but its focus on five solvents from the general causation phase calls into question how closely it evaluated the materials. *See* Doc. 230 p. 4 (wrongly stating that "Dr. Kantor ... conclude[s] that the

---

[14] Doc. 230 p. 9-10 (citing Dr. Kantor's deposition transcript at 115:3-5 (Doc. 58-3 p. 30)).

[15] *See* Appellant Br. at 27-28 (Doc. 18 p. 36-37) (discussing Gerhardsson 2021 (Doc. 138-5) and Bostrom 2019 (Doc. 138-4)). *See also* Barragan-Martinez 2012, Doc. 138-2 p. 1, 12 (identifying TCE and PCE as among the solvents encompassed in the meta-analysis and concluding that "MS show a significant association with OSs [organic solvents] exposure").

[16] *See* Doc. 203 p. 2 (the first sentence of Plaintiff's brief explains that "Dr. Daniel Kantor ... offers his expert opinions that Mrs. Davis's exposure to styrene, Trichloroethylene ("TCE"), and Tetrachloroethylene ("PCE") ... 'more likely than not' caused and/or contributed to her development of MS").

[17] Doc. 230 p. 2.

five substances at issue—PCE, TCE, toluene, xylenes, and styrene—could have caused the decedent's MS.").

Regardless, at both the general and specific causation phase, Dr. Kantor relied on epidemiological literature identifying the solvents in this case. As a result, Defendant's reliance on *McClain* and *Rider* for a "chemical analogy" argument is misplaced because Dr. Kantor is not basing his opinion solely on an analogy between a studied substance and a non-studied substance. *See McClain*, 401 F.3d at 1244-46 (finding that an analogy from a study of phenylpropanolamine (PPA) to ephedrine is problematic because the "authors [of the PPA study] draw no conclusions about ephedrine and nowhere say that ephedrine is analogous to PPA in any respect"); *Rider*, 295 F.3d at 1200-01 (analogizing from unspecified ergot alkaloid drugs to show that bromocriptine causes vasoconstriction).

Further, it was not ***just*** the chemical analogy evidence in *McClain* and *Rider* that caused the experts' opinions to be unreliable. In *McClain*, the expert sought to analogize from the health endpoint in the PPA study (hemorrhagic strokes) to a different health endpoint that he opined was caused by ephedrine (ischemic stroke and heart attack). *See* 401 F.3d at 1245-46 ("The authors likewise do not say that PPA is associated with ischemic stroke or heart attack or that one can analogize that because PPA may cause hemorrhagic strokes, it also causes ischemic strokes and heart attacks."). Moreover, the expert "admitted that while the FDA banned PPA

because of the risk of strokes, it authorized ephedrine to replace PPA in over-the-counter medications." *Id*. at 1245. And the expert "offered no epidemiological data. He offered no clinical trials. He offered no animal studies to support his opinions." 401 F.3d at 1251.

Similarly, the expert in *Rider* also sought to analogize to a different health endpoint (hemorrhagic stroke) than what was associated with other ergot alkaloids (ischemic stroke). *See* 295 F.3d at 1202 ("plaintiffs argue that because there is some evidence that bromocriptine causes ischemic stroke, it also causes hemorrhagic stroke. This is the most untenable link in the causal chain. … This is a 'leap of faith' supported by little more than the fact that both conditions are commonly called strokes."). And like in *McClain*, the causation opinion in *Rider* also suffered from a complete "absence of epidemiology." *Id*.

Turning to the two out-of-circuit cases cited by Defendant—neither of which were cited by the district court—*Amorgianos* involved a disconnect between the studies and the health endpoint suffered by the plaintiff just like in *McClain* and *Rider*. *See Amorgianos v. Natl. R.R. Passenger Corp.*, 303 F.3d 256, 270 (2d Cir. 2002) ("all of the articles connecting solvent exposure to peripheral nervous system symptoms found evidence of symmetrical polyneuropathy only, not of the asymmetrical symptoms of which Amorgianos complained"); *see also Amorgianos v. Natl. R.R. Passenger Corp.*, 137 F. Supp. 2d 147, 190 (E.D.N.Y. 2001), aff'd, 303

F.3d 256 (2d Cir. 2002) (finding too great an analytical gap from studies showing "symmetrical, clinically testable, but subjectively unnoticeable sensory or motor deficits" and the plaintiffs' "sudden, permanent sensory and motor deficits of crippling severity and asymmetrical distribution"). Accordingly, it was not so much the studies' inclusion of multiple solvents that was problematic under *Daubert*, but the studies' lack of relevance for the health condition suffered by the plaintiff.

In *Knight*, the court engaged in a case-by-case analysis of five studies (the Olsson, Hardell, Silverman, Siemiatycki and Nilsson studies) to determine that they were not relevant to the plaintiffs' claims. *See Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352-55 (5th Cir. 2007). Beyond noting that certain studies involved chemicals to which the plaintiffs were not exposed, the court offered additional reasons why each study was not relevant to the plaintiffs' claims. For example, the Olsson study included three shipyard workers exposed to solvents for an average of 10 years and none developed Hodgkin's lymphoma, whereas the plaintiff alleged he developed Hodgkin's lymphoma as a result of working as a tankerman for one year. *Id*. at 352-53 ("Thus, the Olsson study does not appear to be very relevant to Knight's claim."). The *Knight* Court's analysis of the studies is precisely what the district court failed to do in this case.

In addition to having multiple reasons why the studies were irrelevant or unreliable in *McClain*, *Rider*, *Amorgianos* and *Knight*, there is another notable

difference. None of those cases included meta-analyses showing an association between the chemicals at issue and the relevant health endpoint. Here, Dr. Kantor has offered three meta-analyses showing statistically significant associations between solvents and multiple sclerosis (Landtblom 1996, Barragan-Martinez 2012, Gerhardsson 2021)[18] with two of those analyses identifying TCE and PCE as among the solvents being studied (Barragan-Martinez 2012 and Gerhardsson 2021).[19] This is notable because meta-analyses are a "well-established method generally relied upon by epidemiologists" to strengthen the results of individual studies, *see In re Zoloft (Sertraline Hydrochloride) Products Liab. Litig.*, 26 F. Supp. 3d 449, 457 (E.D. Pa. 2014), yet the district court failed to acknowledge the relevance or reliability of these meta-analyses.

## III. Dr. Kantor reliably weighed the evidence and he is not required to document the weighing process in his report.

In Argument Section I(C), Defendant—like the district court—fails to cite precedent from this Court to support the idea that an expert's literature-based causation opinion is only reliable if the expert adequately documents ***in writing*** the process of gathering and weighing the literature. And indeed, this Court has never

---

[18] Doc. 138-11; Doc. 138-2; Doc. 138-5.

[19] Doc. 138-5 p. 2 (identifying trichloroethylene (TCE) and tetrachloroethylene (PCE) as "common organic solvents" in the studies); Doc. 138-2 p. 1 (identifying trichloroethylene (TCE) and tetrachloroethylene/ perchloroethylene (PCE) as among the solvents studied).

imposed such a requirement.[20] Rather, in four *Daubert* decisions from this Court that address how to analyze literature-based causation opinions in toxic tort cases (*Hendrix*, *Rider*, *Allison*, and *Kilpatrick*), there is no indication that so-called "process problems" are a basis for excluding an expert.[21]

To the contrary, a close read of this Court's precedents shows that the Court has not been concerned with an expert's literature-weighing process when assessing reliability, and instead conducts its own analysis of the literature. For example, in *Kilpatrick*, the expert offered articles to support his causation opinion and, as already discussed, this Court evaluated reliability of the opinion based solely on an analysis of the literature. *See* 613 F.3d at 1337-40. But more tellingly, the appellant in *Kilpatrick* "list[ed] … additional articles and studies that he contends Dr. Poehling relied upon in reaching his conclusions." *Id.* at 1340. In response, this Court stated that the appellant was "partially correct—a review of Dr. Poehling's deposition testimony shows that he mentioned one additional article—a January 2008 study of

---

[20] As explained in Plaintiff's opening brief, Dr. Kantor did weigh the studies and apply the Bradford Hill criteria when analyzing whether the studies could support causation, as demonstrated in his deposition testimony and rebuttal report. *See* Appellant Br. at 34-5 (Doc. 18 p. 43-4) (citing Doc. 58-2 p. 4; Doc. 58-3 p. 9-10). But Defendant is arguing for a stricter standard where the expert must document this process in an initial expert report, which is not a standard that this Court has ever imposed.

[21] *See* Doc. 230 p. 9 (concluding that "the process problems with what Dr. Kantor included and omitted from his report require exclusion of his methodology as unreliable").

cow and human cartilage by Dr. Constance Chu." *Id.* The Court then went on to analyze the Chu study. *Id.* at 1340-41. Thus, in *Kilpatrick*, an expert only needed to "mention" a study at his deposition for the Court to consider it as a basis of his opinion. And such a result makes sense because so long as a litigant is afforded the opportunity to discover the bases for an adverse expert's opinion through deposition questioning, any deficiencies in the expert report are harmless. *See, e.g., Littell v. U.S.*, 2004 WL 5633783, at *2 (M.D. Fla. Mar. 19, 2004) (holding that a party's "failure to timely disclose the experts may be found harmless" where the adverse party "had an opportunity to discover the bases of their opinions" at a deposition).

Without support from Eleventh Circuit case law, Defendant looks to Federal Rule of Civil Procedure 26; however, the plain text of the rule certainly does not address the question of whether or how an expert must document a literature-weighing process in the report. Rather, Rule 26(a)(2) has been construed by this Court as only requiring an expert to timely disclose the literature on which an opinion is based. *See Mitchell v. Ford Motor Co.*, 318 Fed. Appx. 821, 823 (11th Cir. 2009) (confining an expert opinion to "the three scientific papers provided in his Rule 26 disclosure" and striking later-disclosed references); *id.* at 825 (endorsing the view that if scientific literature is "specifically referred to … in the Rule 26(a) report or the deposition" then disclosure is adequate). Moreover, the remedy for failure to disclose information under Rule 26(a)(2) is to seek sanctions under Rule 37(c)(1),

which Defendant has not done. *See* Fed. R. Civ. P. 37(c)(1) (providing that a court may impose sanctions "[i]f a party fails to provide information … as required by Rule 26(a)…").

Lastly, it is worth noting that Defendant disclosed its own expert, Dr. Mundt, who reviewed the literature and authored a nearly 200-page report with over 20 pages of references.[22] By way of example, Dr. Mundt reviewed and cited over a dozen studies relevant to TCE to conclude:

> [T]he central nervous system is a likely target for TCE toxicity. … Intermediate- and chronic-duration occupational exposure to TCE have been associated with neurological symptoms, increased postural sway, increased tremor, damage to cranial nerves, memory loss, mood swings, trigeminal neuropathy, decreased psychomotor function, impaired acoustic-motor function, and psychotic behavior.[23]

So not only do some of Dr. Mundt's findings corroborate Dr. Kantor's opinions, but the notion that Dr. Kantor missed relevant studies in his analysis because of a deficient literature-gathering and weighing process[24] should be quelled by the fact that Defendant's expert could not identify any such missing studies.[25]

---

[22] *See* Doc. 72-1.

[23] Doc. 72-1 p. 56.

[24] *See* Doc. 230 p. 8 (stating "there is no telling what studies contradicted" Dr. Kantor and "there are apparently studies out there" that "Dr. Kantor omitted … from the Court's (and the jury's) view").

[25] *See* Doc. 174-3 p. 107 (Tr. at 106:12-15) (Q. "And you haven't identified any specific studies that Dr. Kantor should have reviewed, but did not, have you?" A. "I do not…").

**IV. The district court was not entitled to "ignore" secondary evidence.**

In Argument Section I(D), Defendant argues that "[t]he District Court would have been well within its rights to ignore Dr. Kantor's secondary evidence altogether," and cites *Chapman* as support.[26] But in *Chapman*, the experts offered no primary methodology at all. *See* 766 F.3d at 1308 (citing "the deposition admissions" of the experts showing "their lack of knowledge of dose-response, epidemiological evidence, and background risk of disease"). Thus, it was only in the complete absence of a primary methodology that secondary evidence, standing alone, could be ignored. *Id*.

This case is different from *Chapman* because Dr. Kantor has employed a primary methodology by offering a large body of epidemiological evidence in support of his causation opinion. Accordingly, the point that Plaintiff made in his opening brief, but which may have been misunderstood by Defendant, is that secondary evidence helps confirm the epidemiological evidence—i.e., it serves as "confirmatory pieces of the totality of the evidence."[27]

That is especially true here, where Defendant is arguing that the epidemiology does not tell us enough about the individual solvents at issue. Therefore, the animal

---

[26] Appellee Br. at 35 (Doc. 29 p. 44) (citing *Chapman*, 766 F.3d at 1308).
[27] *See* Appellant Br. at 21-22 (Doc. 18 p. 30-3) (quoting *Seroquel*, 2009 WL 3806435, at *8-9, as well as citing *Siharath* and *Chapman*, for the premise that a district court should analyze the totality of the evidence consisting of secondary evidence offered in conjunction with a primary methodology).

studies of the individual solvents confirm and support the reliability of the epidemiology. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 779 (3d Cir. 1994) ("when there is a concordance of animal data and human data, it strengthens the reliability of each"); *see id*. at 781 ("where the epidemiological data is inconclusive and some of it supports a finding of causation, we think that the district court abused its discretion in excluding the animal studies").

Not only are the animal studies confirmed by the epidemiology and vice versa, but as Dr. Kantor explained at his deposition with respect to the individual solvents in this case "exposure to them can cause in animals changes that are consistent with the changes that would happen in a human with multiple sclerosis."[28] For example, Dr. Kantor explained in his report that multiple sclerosis in humans is characterized by "damage to the myelin covering of the nerves" and that "[d]emyelinating effects in nerves, including decreased myelin thickness, decreased nerve fiber diameter, decreased internode length, and altered fatty acid composition in lipid extracts have been observed in studies of rat exposures to TCE."[29] So the idea that Dr. Kantor failed to offer a basis for considering the animal studies as confirmatory pieces of the puzzle is, simply, incorrect.

---

[28] Doc. 58-3 p. 29-30 (Tr. at 113:24-114:2).
[29] Doc. 58-1 p. 10, 29.

Turning to the NIEHS expert consensus statement, Defendant appears to concede that the district court mischaracterized this evidence as a public health risk assessment when it is not.[30] This alone is an abuse of discretion. *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 989 (11th Cir. 2016) (finding an abuse of discretion where the district court "mischaracterized the evidentiary support for [the expert's] opinion"); *United States v. Alabama Power Co.*, 730 F.3d 1278, 1284–88 (11th Cir.2013) (same).

Recognizing that the district court erred in this regard, Defendant challenges the substance of the NIEHS consensus statement. But Defendant cannot avoid the fact that "an interdisciplinary group of experts from the environmental health science and autoimmune research communities," after "review[ing] the literature and evaluat[ing] the state of the science," found it "likely" that solvents contribute to the development of multiple sclerosis.[31] This is inarguably relevant and compelling evidence in this case because it shows that another group of experts reviewed some of the same studies and came to a similar conclusion as Dr. Kantor did, and then those experts' conclusions were published in a peer-reviewed journal.[32] Defendant is, of course, free to point out limitations of the studies underlying the expert panel's

---

[30] Appellee Br. at 37-8 (Doc. 29 p. 46-7) (arguing that an NRC paper "*was* a risk-assessment" but making no similar claim about the NIEHS consensus statement).

[31] Doc. 138-17 p. 3, 13.

[32] Doc. 138-17. *See* https://www.mdpi.com/journal/ijms ("International Journal of Molecular Sciences is an international, peer-reviewed, open access journal").

finding, but such goes to weight and not admissibility. *Quiet Technology DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003) ("in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." (quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002)).

## V. A dose-response assessment is not required when an expert has established general causation with epidemiological evidence.

In Argument Section II of its brief, Defendant argues that "dose-response assessments … are essential to reliable specific causation opinions,"[33] and Defendant relies on *Williams*, *Pinares*, and *McClain* to make that argument.[34] But there is a critical distinction between those cases and this case that Defendant overlooks. In those cases, the experts ***chose*** to rely on a dose-response methodology to establish general causation ***instead*** of relying on epidemiological evidence like Dr. Kantor did

---

[33] Appellee Br. at 42 (Doc. 29 p. 51).

[34] This argument is really asking the Court to decide, at least in part, a *Daubert* motion pertaining to Dr. Kantor's specific causation opinions that the district court never ruled on (*see* Motion, Doc. 170; Opposition, Doc. 203). To determine that motion, it would also be necessary to address Defendant's *Daubert* motion pertaining to Dr. Ranajit Sahu's exposure assessment (*see* Motion, Doc. 183; Opposition, Doc. 195). These two motions were not addressed in the district court's decision and therefore this Court need not reach those arguments. *See Gulfpoint Constr. Co., Inc. v. Westfield Ins. Co.*, 2024 WL 1759288, at *7 (11th Cir. Apr. 24, 2024) ("Rather than decide that question in the place of the district court, we conclude the better course is to vacate the grant of summary judgment and remand for the district court to consider the matter in the first instance."). Nonetheless, Plaintiff welcomes guidance from this court on the role, if any, of dose-response evidence in a case where general causation is established with epidemiology.

in this case. This distinction is important because epidemiology is "generally considered to be the best evidence of causation in toxic tort actions." *Rider*, 295 F.3d at 1198. And a dose-response assessment is an entirely different type of evidence. *See Chapman v. Procter & Gamble Distribg.*, 766 F.3d 1296, 1308 (11th Cir. 2014) (listing "dose-response, epidemiological evidence, and background risk of disease" as three separate methodologies).

Thus, when Defendant cites *Williams* as imposing a requirement for dose-response evidence in this case, that is misleading because in *Williams* "the expert purported to conduct a dose-response assessment" to establish general causation. *See Pinares v. Raytheon Techs. Corp.*, 2023 WL 2661521, at *4 (11th Cir. Mar. 28, 2023) (summarizing *Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1244-48 (11th Cir. 2018)). The same was true in *Pinares*. *See* 2023 WL 2661521, at *4 ("Like the expert in *Williams*, Dr. Wylie purported to conduct a dose-response assessment"). So, naturally, the experts in *Williams* and *Pinares* were required to perform reliable dose-response assessments to establish general causation because they chose to rely on that type of methodology in lieu of other methodologies.

It does **not** follow from *Williams* and *Pinares* that an expert relying on epidemiology must thereafter perform a dose-response assessment to support specific causation opinions. That would only be true if the expert had first relied on a dose-response assessment to establish general causation. The *Pinares* decision

demonstrated this point when the Court addressed the specific causation experts, Dr. Danoff and Dr. Schecter, after determining that Dr. Wylie's dose-response assessment failed to reliably establish general causation.

> And without a dose-response assessment to establish general causation that the contaminants could generally cause kidney cancer, Dr. Danoff and Dr. Schecter had no "reliable groundwork" to support their specific causation opinions that the contaminants specifically caused Mrs. Pinares's kidney cancer.

*Pinares*, 2023 WL 2661521, at *5 (quoting *Williams*, 889 F.3d at 1248). Stated differently, had Dr. Wylie established general causation with epidemiological evidence, that general-causation methodology could have served as the "reliable groundwork" for the specific causation opinions.

The same conclusion can be drawn from *McClain* where the expert acknowledged a "dose-driven" effect of the drug in question and the evidence showed safe doses "in hundreds of over-the-counter products available to the public." *McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1241 (11th Cir. 2005). Under those facts, it makes sense that the Court was looking for reliable dose-response evidence to determine "how much is too much." *Id*. But more tellingly, after discussing the expert's unreliable dose-response evidence, the Court explained that epidemiology might have provided a reliable basis for the expert's opinions. *Id*. at 1251 ("It is also important to consider what other evidence O'Donnell failed to

present that might have supported the reliability of his opinions in this case. He offered no epidemiological data. …").

Here, when Dr. Kantor established general causation with epidemiology, he laid the "reliable groundwork" to support his specific causation opinions that are based on a differential diagnosis methodology.[35] As this Court has explained, "differential diagnosis as a scientifically accepted methodology meets the *Daubert* guiding factors for district judges in deciding reliability." *Chapman*, 766 F.3d at 1309; *Hendrix*, 609 F.3d at 1195 ("the differential etiology method can provide a valid basis for medical causation opinions"). And while it is true that "[d]ifferential diagnosis … 'will not usually overcome the fundamental failure of laying a scientific groundwork for the general toxicity of the drug and that it can cause the harm a plaintiff suffered,'" *id*. (quoting *McClain*, 401 F.3d at 1252), it is also true that epidemiology is the "best evidence" for laying the scientific groundwork to establish general causation. *See Rider*, 295 F.3d at 1198; *see also Hendrix*, 609 F.3d at 1196 ("we will admit expert [general causation] opinions pursuant to *Daubert* that are supported by epidemiological studies").

Under this framework, the whole of Plaintiff's expert causation evidence can be broken down into three steps:

---

[35] *See* Doc. 157-7 p. 5-6 (performing differential diagnosis to rule out all other risk factors for multiple sclerosis leaving solvent exposure as the only likely cause).

1. Dr. Kantor established general causation via reference to numerous epidemiological studies, as well as animal studies and explanations of the mechanisms of action, showing that TCE, PCE and styrene are capable of causing multiple sclerosis.

2. Dr. Sahu connected the epidemiological studies to the facts of this case by performing a qualitative analysis to determine that the occupational exposure conditions in the epidemiological studies are similar to the occupational exposures suffered by Mrs. Davis, meaning that her exposures were capable of causing multiple sclerosis.

3. Dr. Kantor established specific causation by using a differential diagnosis methodology to rule out all potential causes of multiple sclerosis except one—the chemicals to which she was exposed at Defendant's facility.

This is not to say that an expert can or should entirely ignore the dose-response relationship, and Dr. Kantor has not done so here.[36]

> But, it must also be recognized that "[o]nly rarely are humans exposed to chemicals in a manner that permits a quantitative determination of adverse outcomes.... Human exposure occurs most frequently in occupational settings where workers are exposed to industrial chemicals like lead or asbestos; however, even under these circumstances, it is usually difficult, if not impossible, to quantify the amount of exposure."

---

[36] *See* Doc. 58-1 at 27-8 (discussing the non-threshold dose-response effect of the chemicals in this case).

> Consequently, while precise information concerning the exposure necessary to cause specific harm to humans and exact details pertaining to the plaintiff's exposure are beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic to humans given substantial exposure and need not invariably provide the basis for an expert's opinion on causation.

*Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 264 (4th Cir. 1999) (quoting Federal Judicial Center, Reference Manual on Scientific Evidence 187 (1994)); *see also Williams*, 889 F.3d at 1248 ("To be clear, we have never required an expert to 'give precise numbers about a dose-response relationship,' *McClain*, 401 F.3d at 1241 n.6, and we do not do so here.").

Here, because Mrs. Davis was exposed to industrial chemicals in an occupational setting, it would be "difficult, if not impossible, to quantify the amount of exposure." *Westberry*, 178 F.3d at 264. But that does not mean that her case is impossible to prove; rather, it means that a dose-response assessment may not be a reliable or necessary methodology for proving causation in her case because the evidence is not available to perform that type of methodology.

In sum, Defendant goes too far with its dose-response argument when claiming that "dose-response assessments … are essential to reliable specific causation opinions."[37] That is true ***only if*** the expert is proceeding with a dose-response methodology in lieu of another reliable methodology that this Court

---

[37] Appellee Br. at 42 (Doc. 29 p. 51).

recognizes—such as epidemiology. After an expert establishes general causation via epidemiology or otherwise (i.e., demonstrating that the substance at issue is capable of causing the disease in question), then general causation becomes the "reliable groundwork" for employing a differential diagnosis methodology at the specific causation stage, where the expert rules in and out potential causes of the disease.

## CONCLUSION

This Court consistently finds an abuse of discretion where the district court fails to evaluate the evidence supporting an expert opinion. Plaintiff respectfully requests that same result here.

Dated: June 12, 2024                     Respectfully submitted,

/s/ Josh Autry
Josh Autry
Morgan & Morgan
333 W Vine St, Ste 1200
Lexington, KY 40507
859-899-8785
jautry@forthepeople.com

/s/ Rene F. Rocha
Rene F. Rocha
Morgan & Morgan
400 Poydras St, Ste 1515
New Orleans, LA 70130
954-318-0268
rrocha@forthepeople.com

/s/ Adam P. Bergeron
Adam P. Bergeron
Morgan & Morgan
47 Maple St, Ste 104D
Burlington, VT 05401
407-974-2075
adambergeron@forthepeople.com

*Attorneys for Appellant Michael Davis*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(ii) because, excluding the parts exempted by Fed. R. App. P. 32(f), this brief contains 5991 words.

*/s/ Adam P. Bergeron*